JT Glover III
46 Quincy Street #5
North Adams, MA 01247
413-664-9093

**United States District Court**
**Eastern District Of Massachusetts**

| | |
|---|---|
| JT Glover III, pro-se | ) |
|     Plaintiff | ) |
| | ) |
| Vs. | ) |
| | ) |
| Representatives affiliated | ) |
| with the Massachusetts | ) |
| Department of Mental | ) |
| Retardation-Boston | ) |
| | ) |
| Mr. Gerald Morrissey | ) |
| Mr. Peter Morin | ) |
| Mr. Bernard Murphy | ) |
| Ms. Pamela Nicholson | ) |
| Mr. Larry Tummino | ) |
|     Defendants | ) |

**03 11633 DPW**

MAGISTRATE JUDGE Cohen

RECEIPT # 49955
AMOUNT $ 150
SUMMONS ISSUED Yes
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. KOM
DATE 09/02/03

The plaintiff, Mr. JT Glover III, alleges specific personnel affiliated with the Department of Mental Retardation engaged in a depravation of civil rights (First Amendment Rights/Freedom of Speech/Expression Activities) by inappropriately interfering with Mr. Glover's effort of redressing mishandled investigations conducted by this agency's Division of Investigations/Appeals Unit.

Factual Assertions: refer to Introduction and Relevant Background statements.

WHEREFORE, Plaintiff prays for judgement against defendants in the sum of $200,000 dollars for each of the above-mentioned representatives of this agency, plus costs and interests, and any other relief the court deems appropriate.

JT Glover III, Plaintiff by Pro Se

Complaint verified on this date, August 29, 2003

## Table of Contents

I.      Introductory Statement: paragraphs 1-8
II.     Relevant Background & Factual Averments: paragraphs 1-111
III.    Closing statement
IV.     Causes of Action: US Title 42 Section 1983
V.      Enclosures (1)

**I. Introduction:**

1.     The plaintiff, JT Glover III, was employed by Berkshire Family And Individual Resources, Inc (hereinafter known as 'BFAIR, Inc') located in North Adams, Ma whom provides various community and residential services for the Massachusetts Department of Mental Retardation (hereinafter known as 'DMR'). On July 13, 1999, Mr. Glover was terminated from his position for confronting another staff member about this person's long-term maltreatment towards residents born with developmental disabilities in a group home where he and Mr. Glover worked located in Williamstown, Massachusetts.

2.     On July 20, 1999, Mr. Glover commenced reporting these longstanding acts of abuse and mistreatment regarding his former coworker to the Disabled Persons Protection Commission (hereinafter known as DPPC) located in Quincy, MA. The DPPC subsequently assigned these allegations of abuse and mistreatment to be investigated by specific employees of the DMR's Division of Investigations/Western Regional offices, located in Pittsfield and Springfield, MA.

3.     These events initiated by individuals no longer affiliated with BFAIR, Inc and Mr. Glover have worked themselves into ongoing concerns involving the aforementioned employees within the DMR because of their individual participation in the mishandling of these specific investigations. It is Mr. Glover's wish for the US District Court to understand this correlation, and why both agencies are being cited in this complaint.

4.     Through information obtained by an informal process of investigation, the DMR Division of Investigations/Appeals Unit/Central office has included deceptive information and numerous descrepancies in voluminous documentation pertaining to these investigations (and the appeal report), which constitutes an abuse of authority. The plaintiff has made the utmost effort to bring these systemic problems surrounding these matters to the attention of specific personnel affiliated with the DMR, DPPC, and other offices as well. Several employees of the DMR have met Mr. Glover's efforts with much resistance and denial.

5.     Individuals affiliated with the DMR's Boston, Pittsfield and Springfield offices, have in some capacity, mishandled these investigations, and on a repeated basis, have engaged in a pattern of activity, interfering with Mr. Glover's rights of petitioning various governmental offices to redress these grievances. It is Mr. Glover's assertion, these rights-guaranteed in the First Amendment of the Constitution of the United States-allows him to redress these mishandled investigations/appeal report and other inappropriate conduct partaken by individuals employed with the DMR by initiating these civil legal proceedings; and other means deemed appropriate.

6.     These accumulating matters indicate violations pursuant to 42 USC section 1983 and Massachusetts General Laws c 12, 11H &I, transgressed by individuals affiliated with the DMR whom acted under the color of state law depriving Mr. Glover of rights, privileges, or immunities secured by the US Constitution or laws of the United States and the Commonwealth of Massachusetts.

7.    Mr. Glover assures the US District Court remaining in his possession is ample documentation indicating a preponderance of evidence, corroborating these claims being made in this complaint. The plaintiff remains hopeful that the defendants, whom are being sued in their official capacities, and their legal counsel will act in a good faith manner by providing equitable relief and allowing appropriate redress of these accumulating circumstances.

8.    Furthermore, Mr. Glover is under the impression other legal violations have transpired pursuant to Massachusetts General Laws 258 (Massachusetts Tort Claims Act). Mr. Glover is preparing a presentment letter, which will be delivered, via certified mail, to the appropriate executive officer of the DMR; or alternatively, the Attorney General of the Commonwealth of Massachusetts in the appropriate time allowable regarding these additional claims.

## II. Relevant Background & Factual Averments:

1.     The plaintiff, Mr. JT Glover III, was employed by BFAIR, Inc located in North Adams, MA between August 29, 1996 and July 13, 1999. His duties consisted of supervising three adults born with developmental disabilities in a group home located in Williamstown, Massachusetts. Mr. Glover grew to love his position and the gentlemen for whom he was employed to care for. Spending countless hours with these special souls greatly impacted Mr. Glover's life.

2.     Beginning in fall 1996, Mr. Glover began witnessing sporadic instances of disturbing behavior exhibited by another former employee of BFAIR, Inc, Mr. Steven Conlon, towards the residents under his care. These incidents consisted of numerous examples of blatant verbal abuse, sporadic physical abuse and mistreatment (refer to detailed summarized reports, submitted via priority mail, to both the DPPC and DMR on July 22, 1999).

3.     Mr. Glover felt intimidated to report these circumstances for nearly two years based on information provided to him by the program's former human rights officer. This person informed Mr. Glover about an instance of administrative personnel no longer affiliated with BFAIR, Inc mishandling an allegation brought against an employee working in this group home before the plaintiff worked there.

4.     This incident allegedly involved a staff member dragging a resident confined to a wheel chair from the bathroom to his room. As a result of this, the resident's shirt was torn. This incident was brought to the attention of this human rights officer referred to in paragraph 3.

5.      Subsequently, the human rights officer briefed specific personnel no longer affiliated with BFAIR, Inc about this matter. Appropriate action was not taken and the employee whom allegedly committed this act remained working at the program. Learning about this event, as well as information noted in paragraphs 6 and 7, directly contributed to Mr. Glover's delay in reporting acts of abuse and mistreatment occurring in the group home.

6.      In early 1997, Mr. Glover began journal writing about these accumulating circumstances occurring at the Williamstown group home, which disturbed him greatly. Additionally, while attending the University of Massachusetts-Amherst in the fall 1998/spring 1999 semesters, Mr. Glover wrote term papers about various aspects relating to his experience working in this particular group home.  Subject matter mainly focused on Mr. Glover's distress over the occurrences of abuse and mistreatment being perpetrated towards the residents living at this group home and the reasons behind his reluctance to report these circumstances in timely manner.

7.      At the same time, Mr. Glover also familiarized himself with several articles written in The Boston Globe throughout the 1990's about the long-term problems facing the Division of Investigations of the DMR. These systemic shortcomings within the DMR also contributed to Mr. Glover's delay in reporting abuse occurring in the Williamstown group home. These accumulating problems facing the DMR were noted in term papers written by Mr. Glover as well.

8.    In December 1998, Mr. Glover briefed his program manager, Ms. Tammy Dumas and the same human rights officer as noted in paragraph 3 about Mr. Conlon's long-term inappropriate treatment towards the residents living at the group home. Within a week of being notified about these events, Ms. Dumas briefed Mr. Glover, 'to forget about these issues for now and that she would address them at a later time.'

9.    On Sunday morning, July 11, 1999, Mr. Glover drove to the group home to make a notation in the communications book about the resident's storage of medications. While at the program, Mr. Glover informed Mr. Conlon that he was going to report him for all his inappropriate treatment perpetrated against the residents living at the group home. This resulted in a verbal confrontation-most of which occurred outside of the group home away from the residents. It should be noted that two of the residents were in their perspective room's sleeping-at the time of Mr. Glover's arrival at his place of employment and never came out of their rooms, which has relevance to the information contained in paragraphs 15-16 and 23.

10.    On the morning, of July 12, 1999, after working a shift (at the program) following his verbal confrontation with Mr. Colon, Mr. Glover informed Ms. Dumas and the former Director of Residential Services, Mr. James Summers-whom are both no longer employed with BFAIR, Inc-that he thought this specific group home had a 'tragic history.' Later that afternoon, a meeting was held between these individuals and Mr. Glover.

11.    In this meeting, Mr. Glover began discussing, in detail, circumstances (leading up to his confrontation with Mr. Conlon) and the reasons behind his reluctance to report instances of abuse and mistreatment transgressed towards the residents in a timely manner. Ms. Dumas falsely stated that she was never aware of any possibility that inappropriate treatment might have transpired towards the residents until the morning of July 11, 1999.

12.    On the afternoon of July 13, 1999, a second meeting was held between individuals no longer affiliated with BFAIR and Mr. Glover. During this meeting, Mr. Glover made specific allegations of abuse and mistreatment using a report drafted by him while working the overnight shift on July 11, 1999. Subsequently, Mr. Glover was terminated from his position for confronting Mr. Conlon at the group home. Despite Mr. Glover's termination, and not being sure if these accumulating circumstances occurring in the group home would be appropriately investigated, Mr. Glover notified Mr. Summers that he was planning on contacting the DPPC to formally file complaints against Mr. Conlon.

13.    Mr. Glover contacted the DPPC on July 16, 1999 seeking information about reporting the abuse and mistreatment occurring in this group home. He talked with an intake representative of this agency named Ella. On July 18, 1999, Mr. Glover sent an e-mail to DPPC General Counsel Mr. Ralph Calderaro regarding these longstanding concerns. Furthermore, a conference call was held with Mr. Calderaro discussing the content of this e-mail correspondence.

14.      Mr. Glover filed abuse and mistreatment complaints on behalf of two residents on July 20, 1999 with the DPPC pursuant to Massachusetts General Laws 19C. The very next day, on July 21, 1999, Mr. Jeffery Peyman, a DMR Springfield Investigator, assigned by the DPPC to conduct these investigations, interviewed both Mr. Glover and his sister, Ms. Allison Glover, separately, at their home in North Adams, MA.

15.      During his interview with Mr. Peyman, Mr. Glover discovered that Mr. Conlon contacted the DPPC on July 13, 1999 and knowingly reported misleading allegations against him. Mr. Conlon reported to the DPCC intake officer that 'while the officer was in the car, Mr. Glover went into the house in a rage. The reporter stated that (Mr. Glover) was yelling and screaming and trying to get him (Mr. Conlon) to physically hit him. Mr. Conlon stated that residents saw this and started to bang their heads and scream. According to Mr. Conlon the two men (residents) were afraid.'

16.      None of these allegations made by Mr. Conlon regarding Mr. Glover's interaction with him or two of the residents living in the group home on Sunday, July 11, 1999 hold any factual basis.

17.      When interviewing Ms. Glover, she informed Mr. Peyman about her brother's long-term concerns regarding the abuse and mistreatment occurring in the group home, which immediately after their occurrences, Mr. Glover shared with her. She went on to tell Mr. Peyman that Mr. Glover had informed his program manager about these matters (in December 1998) and was left to think they were now out of his hands in how they would be investigated.

18.     On July 21, 1999, Mr. Peyman informed Mr. Glover about additional false information provided by individuals no longer affiliated with BFAIR, Inc. Ms. Dumas informed Mr. Peyman during her interview on July 14, 1999 that she was never aware of the possibility of any abuse or maltreatment being perpetrated against the residents until Mr. Glover notified her about these circumstances until the morning of July 11, 1999.

**19.**     After resigning from BFAIR, Inc, Ms. Dumas recanted these initial statements during a follow up interview on September 27, 1999 with this same DMR investigator. Ms. Dumas informed Mr. Peyman that Mr. Glover had made allegations to her in December 1998 about Mr. Conlon's inappropriate behaviors occurring in the group home.

20.     Mr. Glover provided DMR Investigator Peymen with the names of four individuals who had information surrounding Mr. Glover's concerns relating to Mr. Conlon's inappropriate treatment transgressed towards the residents living in the group home. According to Mr. Steven Tatro, Mr. Peyman never contacted him to obtain information for this investigation.

21.     On July 22, 1999, Mr. Glover sent, via priority mail, detailed reports citing specifics (note DMR Appeal Report, pages 23, 26) surrounding the abuse and mistreatment witnessed at the group home to both Mr. Peyman of DMR Springfield and Mr. Calderaro of the DPPC.

22.    In August 1999, by the request of Mr. Glover, DMR Investigator Peyman contacted Mr. Paul Maselli, whom had witnessed events similar to aspects of Mr. Glover' allegations against Mr. Conlon. Initially, Mr. Maselli was reluctant to inform Mr. Peyman about past abuses he had witnessed at his former place of employment. His reasons, largely in part, were due to fear of retaliation from both the DMR and DPPC for his failure serving as a 'mandated reporter' pursuant to Massachusetts General Laws 19C.

23.    On August 9, 1999, Mr. John Foster, the Assistant Director of the DMR Berkshire Area office in Pittsfield compiled a 'action plan' relating to the false allegations filed against Mr. Glover (by Mr. Conlon).

24.    Listed is the following excerpt: 'it is noted that the management of the contracting residential agency became responsively involved almost immediately after the incident. The employee (Mr. Glover) accused was placed on suspended status until the management of the agency was able to determine what occurred. Subsequent to the management review of the situation, the accused employee had his employment terminated for his behaviors during the incident. There is no evidence that any of the three men served experienced any lasting emotional harm from the incident.'

25.    It should be noted not at anytime, was Mr. Glover ever placed on 'suspended status as alleged in this specific DMR 'Action Plan.' Mr. Glover was permitted to work a thirteen-hour overnight shift on July 11, 1999-well after his verbal confrontation with Mr. Conlon had occurred.

26.     In August 1999, after Mr. Glover received the action plan noted in paragraph 23, he met with DMR Berkshire Area Director Mr. Rick Huntington in Pittsfield, MA. Mr. Glover had immense concerns regarding this specific investigation since it was initiated from deceitful information provided to the DPPC and DMR Investigator Peyman by Mr. Conlon. At the end of their meeting, Mr. Huntington suggested to Mr. Glover, if he so desired, he could contact Ms. Maureen Kirk, a supervisor in some capacity, of the Division of Investigations from DMR Springfield to discuss these matters.

27.     On November 10-12, 1999, when receiving additional DMR documentation and subsequently having a phone conference with Mr. Peyman regarding these investigations initiated on July 20, 1999, Mr. Glover discovered additional false information. Behavioral reactions occurring on July 11, 1999 involving two residents living at the group home were continually being distorted, along with previous conversations held between Mr. Glover and other individuals which yielded false information about the long-term abuse and mistreatment transgressed towards the residents at the group home.

28.     Please note the following excerpts taken from the minute notes complied by DMR Investigator Jeff Peyman and his conclusions included in the October 5, 1999 DMR investigative report Mr. Glover received on November 10, 1999:

29.     "Mr. Glover was terminated on July 13, 1999 because he showed up at the program on his day off to tell someone in the communication book because he forgot to enter something in it. Staff person C and Mr. Glover then had a verbal argument. Mr. Glover stated that there is more to this story and will be sending documentation explaining everything and why he didn't report (abuse and mistreatment allegations) right away. Mr. Glover is meeting with DMR Investigator Jeff Peyman today."

30.     "BFAIR has chosen to initiate an investigation focusing on (Mr. Glover). BFAIR management is saying (Mr. Glover) going into the program on July 11, 1999 upset two clients causing them to bang their heads against the wall. (Mr. Glover) stated this did not happen and they (BFAIR, INC) are fabricating the story to get rid of him. (Mr. Glover's) employer gave misinformation to the Williamstown Police Department saying that someone gave him a standing order that he was not supposed to be at the program when Staff person Conlon is working and (Mr. Glover) stated this is totally false."

31.     'There is reason to accept the interpretation that the allegations (Mr. Glover's) were knowingly filed in a false and misleading manner as retaliation against the accused employee for a DPPC complaint he (Staff person Conlon's) had previously filed.'

32.    On November 14, 1999, Mr. Glover informed Mr. Peyman it was impossible his allegations made (against Mr. Conlon) were 'knowingly filed in a false and misleading manner' since he had been writing about these events saving this information on computer disks for over two years. Mr. Glover then briefed DMR Investigator Peyman that Mr. Maselli, a person whom could corroborate some of Mr. Glover's allegations, had more information to offer than what he initially provided to Mr. Peyman during their phone interview in August 1999.

33.    During the week of November 14, 1999, Mr. Glover provided the DMR's Boston, Pittsfield and Boston offices with additional information, via facsimile transmissions, citing evidence the Division of Investigations of Springfield had mishandled these specific investigations. On November 15, 1999, Mr. Glover filed an appeal directly to DMR Commissioner Mr. Gerald J. Morrissey, Jr. Additional documentation was faxed to the Commissioner's office during this same week as well.

34.    Mr. Glover sent an e-mail specifically to DMR Springfield Regional Director Ms. Theresa O'Hare on November 14, 1999 requesting an appeal investigation and meeting(s) to be held with various DMR employees allowing Mr. Glover the chance to redress these mishandled investigations. Mr. Glover never received a response from Ms. O'Hare regarding this e-mail communication sent to her.

35.    On the evening of November 16, 1999, Mr. Glover met with Mr. Peyman and Senior Investigator of DMR-Springfield, Mr. Steven Williams. Printed information was provided to these individuals from Mr. Glover's computer disks. On this same night, another former BFAIR, Inc employee, Mr. Paul Maselli, provided new testimony, which now corroborated aspects of Mr. Glover's allegations about Mr. Conlon.

36.    On November 17, 1999, Mr. Glover faxed correspondence to Mr. Rick Huntington-the Director of DMR Berkshire Area office in Pittsfield, MA. In this letter, Mr. Glover requested a follow-up meeting to be held with Mr. Huntington to discuss these mishandled investigations and that a folder of information (printed from Mr. Glover's computer disks) was provided to DMR Springfield employees Mr. Peyman and Mr. Williams on the night of November 16, 1999. During this same week, Mr. Glover attempted to contact Mr. Huntington repeatedly for appropriate follow-up with no avail.

37.    Based on additional information obtained from Mr. Glover and Mr. Maselli regarding the original allegations filed (by Mr. Glover), a follow-up investigation was initiated on November 22, 1999, to be conducted by DMR Springfield Investigator, Mr. Harry T. Comerford.

38.    On November 29, 30, 1999 conversations were held with DMR Springfield employees Mr. Comerford and Ms. Kirk, respectively (note cell phone records and page 4 of Mr. Comerford's report). Mr. Glover briefed these individuals he thought the initial investigations conducted by Investigator Peyman required further redress through this follow-up investigation. Mr. Glover informed Mr. Comerford that new information surfaced indicating flawed results were contained in the investigations conducted by DMR Investigator Peyman. During this conversation with Mr. Comerford, he was also made aware that Investigator Peyman and Senior Investigator Williams had been provided with pertinent documentation, from Mr. Glover's computer disks, which held relevance to this new investigation.

39.    Additionally, in November 1999, Mr. Glover made several requests to various DMR officials for the opportunity to meet with them to discuss these mishandled investigations further. These requests were ignored on a repetitive basis.

40.    The information contained in paragraphs 33-39 provide rebuttal evidence indicating several examples of false and misleading information detailed throughout the follow up report conducted by DMR employees Mr. Comerford, Mr. Huntington and Mr. Williams (note enclosure 1).

41.     In November 1999, correspondences also occurred between Mr. Glover and DPPC Deputy General Counsel Ms. Gail Quinn regarding these mishandled investigations. Since Mr. Glover initially reported these allegations of abuse and mistreatment to the DPPC, and these investigations were assigned to the Divisions of Investigations of the DMR by this agency, he hoped the DPPC would eventually provide adequate oversight and rectify these matters.

42.     In December 1999, Mr. Glover met briefly with Ms. Kirk at the DMR Western Regional office in Springfield. Mr. Glover provided her with printed information from computer disks which included a recent term paper written about the DMR mishandling these particular investigations; as well as utilizing other examples of systemic shortcomings facing its' Division of Investigations. This paper was written for one of Mr. Glover's fall 1999 classes he attended, entitled 'Mental Retardation.'

43.    On January 6, 2000, at the request of DPPC Oversight Officer Mr. Andy Zamagni, Senior Investigator Williams compiled an addendum relating to the investigations initiated on July 20, 1999. When Mr. Glover received this addendum, he thought this information was part of the follow-up investigative report by Mr. Comerford since this new investigation was to be completed by January 6, 2000 (note DMR disposition dated November 22, 1999). It was not until October 3, 2000, when conferring with the DMR Senior Appeals Officer, Ms. Nicholson, that Mr. Glover discovered this addendum and Mr. Comerford's follow up investigation existed separately from one another.

44.    On April 4, 2000, Mr. Glover faxed a 'letters of intent' to the offices of DMR in Springfield and Boston. Mr. Glover notified the DMR that he was planning on commencing legal action in effort to redress these matters.

45.    During this same month as well, Mr. Glover provided additional information to individuals affiliated with the DMR, via facsimile transmissions, and sent a follow up e-mail to DMR Springfield Regional Director Ms. O'Hare on April 10, 2000. Because of the inappropriate conduct engaged in by specific individuals of the DMR, which, in some capacity, had been involved in these mishandled investigations, this documentation indicated legal transgressions had occurred. Mr. Glover received a reply from Ms. O'Hare on April 14, 2000. Noted from her e-mail: 'I have reviewed the e-mail you sent me. I will be discussing with other involved parties next week and will reply after my discussions. Thank you.'

46.    Though Mr. Comereford was assigned to conduct a follow-up investigation on November 22, 1999, he did not conduct interviews with Mr. Conlon (whom was still currently employed at the program supervising the same residents whom he abused and mistreated) and Mr. Maselli until April 11, 2000. Mr. Glover discovered this information during a phone conversation held with Mr. Maselli on April 18, 2000. Mr. Maselli informed Mr. Glover that he repeatedly corroborated aspects of the abuse and mistreatment he witnessed in the group home when being interviewed by Mr. Comerford. Furthermore, during this interview, Mr. Comerford inquired to Mr. Maselli about Mr. Glover's present activities of wishing to pursue these matters through legal proceedings as well.

47.     After Mr. Maselli briefed Mr. Glover about the concerns expressed by Mr. Comerford, Mr. Glover sent a letter to Mr. Comeford, via facsimile transmission, on April 19, 2000 regarding this follow up investigation and the questions Mr. Comerford asked Mr. Maselli as noted in paragraph 46.

48.     Even though Mr. Comerford, Mr. Huntington and Mr. Williams completed this the new investigative report on April 27, 2000, Mr. Glover did not learn about its existence until October 3, 2000 and received a copy of it on October 6, 2000.

49.     Subsequently, when reviewing this follow up investigative report, Mr. Glover discovered additional misleading statements and false conclusions contained throughout it (note enclosure 1). Since this follow-up investigation was conducted and summarized in such a deceptive manner, the Division of Investigations of DMR Region I Springfield failed to appropriately redress these mishandled investigations initiated on July 20, 1999.

50.     Additionally, because of the false information included within this follow-up report, it appeared to retaliate against Mr. Glover's freedom of expression and activities in the manner it was conducted. Employees of DMR Springfield were aware of Mr. Glover's wishes to redress these accumulating grievances through legal proceedings three weeks before this investigation was completed on April 27, 2000.

51.     In the fall of 2000, the appeal Mr. Glover originally filed on November 15, 1999 relating to these mishandled investigations was conducted. Mr. Glover made a gallant effort to have DMR Senior Appeals Officer, Ms. Pamela Nicholson reinvestigate the accumulating systemic problems and deceitful practices engaged in by specific individuals affiliated with the DMR Division of Investigations.

52.    Mr. Glover spent great length on the phone with Ms. Nicholson discussing this specific appeal assigned to her, as well as his concerns regarding the legal transgressions committed by individuals employed with the DMR. Ms. Nicholson informed Mr. Glover that her responsibilities conducting this appeal existed independently from the DMR and that she wanted to complete it in the most appropriate manner allowable.

53.    On October 4 and 16, 2000, Ms. Nicholson provided Mr. Glover's informal legal advisor and himself letters regarding the procedural process to be followed by her relating to this specific appeal. These letters hold important factual relevance in the outcome of the flawed results derived in Ms. Nicholson's appeal report conclusions.

54.    Mr. Glover provided Ms. Nicholson with an overabundant of documentation clearly indicating questionable practices involving these investigations conducted by the Division of Investigations of DMR Springfield. Included with this information, was a twelve-page informal rebuttal, to the follow up investigative report conducted by Mr. Comerford, which Mr. Glover mailed directly to DMR Senior Appeals Officer Nicholson on December 19, 2000. The appeal was closed on January 25, 2001 without Ms. Nicholson further reinvestigating the additional descrepancies surrounding Mr. Comerford's investigation (note enclosure 1).

55.    On January 26, 2001, Mr. Glover provided the 12-page document noted in paragraph 54, via fax transmission, to the DMR offices in Boston and Springfield; as well as to DPPC Deputy General Counsel Ms. Quinn. It is Mr. Glover's assertion the information contained in this document indicate these investigations and the appeal require further inquiry.

56.    On January 29, 2001, Mr. Glover provided additional documentation, via regular mail delivery, to DMR Commissioner Mr. Morrissey and Deputy General Counsel, Mr. Peter Morin, as well as to Ms. Quinn of the DPPC. Mr. Glover still had immense concerns relating to these specific investigations and now the appeal report being mishandled by the DMR. In these correspondences, Mr. Glover noted he would be submitting a follow-up memorandum regarding the mistaken conclusions contained in this specific appeal report filed by Ms. Nicholson.

57.    On May 9, 2001, Mr. Glover mailed a packet of information to DPPC Deputy General Counsel Ms. Quinn, which cited numerous descrepancies, which he hoped would eventually initiate appropriate oversight by the DPPC regarding these mishandled investigations and the appeal report conducted by the DMR.

58.    Mr. Glover received a reply from Ms. Quinn on May 29, 2001. In her letter, it is noted: 'the DPPC cannot now undertake the Reconsideration of the Appeal Decision. Therefore, I have forwarded all of the materials you sent to me directly to the Deputy General Counsel for the Department of Mental Retardation, the agency, which must handle your request for a Reconsideration of the Appeal Process.'

59.    On June 14, 2001, because of the information contained in the documentation previously provided to the DPPC, Mr. Glover sent a request to Ms. Quinn, via certified mail, that this agency initiate appropriate oversight into these investigations pursuant to Massachusetts General Laws 19C-sections 3, 5, 9, 11.

60.    On July 20, 2001, Mr. Glover provided the DMR Springfield/Boston offices; as well as the DPPC, via facsimile transmission, an eighteen-page document referred to in paragraph 56. This document specifically details accumulating descrepancies and mistaken conclusions regarding these investigations and the appeal report that Ms. Nicholson filed with DMR Commissioner Morrissey on January 25, 2001.

61.    On August 9, 2001, Mr. Glover sent information, via regular mail delivery, to the Governor's Commission on Mental Retardation (hereinafter known as GCMR). In this correspondence, Mr. Glover provided the GCMR with pertinent information indicating questionable practices surrounding the mishandling of these investigations conducted by the Divisions of Investigations and the Appeals Unit of the DMR. It was Mr. Glover's wish that the GCMR might be able to initialize some type of inquiry into these matters.

62.    On August 17, 2001, Ms. Barbara Mazella, Administrator of the GCMR, contacted Mr. Glover to discuss the information as noted in paragraph 61. During this phone conference, Ms. Mazella informed Mr. Glover that if wished, he could file a complaint with the Office of Attorney General Thomas Reilly citing violations under the Massachusetts Civil Rights Act-Mass General Laws c.12, 11H &I.

63.    Mr. Glover requested from Ms. Mazella that he be allowed to provide the GCMR with additional information indicating individuals affiliated with the DMR's Springfield and Boston offices, had mishandled these specific investigations and appeal report. Mr. Glover welcomed the chance having the GCMR review this specific appeal conducted by DMR Supervising Appeals Officer, Ms. Nicholson and its eighteen page 'rebuttal' (as noted paragraph 60) faxed to DMR offices in Boston, Pittsfield, and Springfield on July 20, 2001.

64.    Upon this request, Ms. Mazella informed Mr. Glover 'that the GCMR powers to serve as Ombudsman are quite limited in scope' and the only assistance she could provide Mr. Glover was researching the procedural protocol, possibly allowing him to further appeal these matters with the DMR.

65.    After this phone call between Ms. Mazella and Mr. Glover, she provided him with follow-up correspondence on August 17, 2001. The content of it reads as follows: 'Per our conversation, I am attaching some information about the Massachusetts Civil Rights Act. If you wish to pursue a complaint under the whistle-blower statue the attorney general's office is the correct mechanism. As I stated in our phone conversation, the Commission's powers to serve as Ombudsman are quite limited in scope and we are not able to consider matters that should be addressed pursuant to "statutes or regulations governing abuse or neglect of persons with mental retardation." (Executive order #429, Article IV. Section 4.1 (b)." I am able to inquire about procedural protocol and will research this issue and contact you shortly.'

66.    Mr. Glover sent a letter of appreciation to Ms. Mazella on August 24, 2001 thanking her for the information she forwarded him, which would allow him to file a complaint with the Attorney General's office regarding these grievances.

67.    On August 29, 2001, Mr. Glover received additional correspondence from Ms. Mazella indicating that she conferred with the DMR about these concerns. In this second letter to Mr. Glover, Ms. Mazella notes: 'I have received your letter dated August 24 and have spoken with individuals in DPPC and DMR regarding your complaint. As I stated in my previous correspondence, we are not able to consider matters that should be addressed pursuant to "statutes or regulations governing abuse or neglect of persons with mental retardation." I have inquired to your procedural rights under this process and according to both DMR and DPPC "the case is closed." Commissioner Morrissey has accepted the findings of the appeal officer and has sent you a letter indicating that decision. Your only option is to file a legal challenge in court and start legal proceedings. Our office has no legal jurisdiction in this matter. Thank you for your inquiry.'

68.    On August 29, 2001, Mr. Glover filed a complaint pursuant to the Massachusetts Civil Rights Act (Mass General Laws c. 12, 11H & I) against the Division of Investigations of the DMR Springfield office with the Office of Attorney General Thomas Reilly. Additionally, with his complaint, Mr. Glover included folders of voluminous documentation indicating questionable conduct surrounding these investigations and the appeal report being mishandled by individuals affiliated with the DMR Boston and Springfield offices.

69.    On September 13, 2001, Mr. Glover conferred with Mr. Philip Jordan, a paralegal from the Disabilities Rights Project affiliated with the Office of the Attorney General. Mr. Jordan told Mr. Glover something to the effect that 'he wasn't sure how these matters would be investigated since the Attorney General's office would end up having to defend (representatives from) the DMR in these matters.' Mr. Jordan then informed Mr. Glover that he was going to refer his complaint to an Assistant Attorney General for possible handling.

70.    On September 21, 2001, Mr. Jordan sent a response to Mr. Glover relating to the information as noted in paragraphs 68-69. In this letter, Mr. Glover is informed that the office of the Attorney General 'will not be able to assist you in this matter' and that 'Furthermore, (this office) represents the Commonwealth of Massachusetts, including state agencies and the courts.'

71.    Initially in August 2001, Mr. Glover provided information to legislative offices in The State House that included former Acting Governor Jane Swift, the House Post Audit and Oversight Bureau/Committee, the Joint Committee on Health and Human Services and Elderly Affairs, Representative Daniel Bosley, and State Senator Andrea Nuciforo, JR regarding these matters. Mr. Glover also provided relevant material to the office of Senator Edward M. Kennedy's Constituent Services in Boston during this same month as well.

72.    Subsequently, phone conferences and meetings were held with individuals from these offices as well. Among these conferences included were with Ms. Tammy Kelsey from the Governor's office in Springfield, Ms. Jennifer Harrington from Senator Nuciforo's office and Ms. Allison Robles from the House Post Audit and Oversight Committee. Both Ms. Kelsey and Ms. Robles understood Mr. Glover's longstanding concerns referring these matters to other personnel from their perspective offices for further investigation. Mr. Glover viewed these activities to be within his First Amendment Rights allowing him to petition various governmental offices to redress these mishandled investigations and appeal report conducted by the DMR.

73.    On August 30, 2001, Mr. Glover received additional correspondence from DPPC Deputy General Counsel Ms. Quinn regarding information previously provided to this agency as noted in paragraphs 41 and 55-60. Mr. Glover forwarded an additional reply to Ms. Quinn, via facsimile transmission, on September 17, 2001.

74.    On November 29, 2001, Mr. Glover received a response from US Senator Edward Kennedy regarding information he provided the Senator's Boston office in August 2001-as noted in paragraph 71. Enclosed with Senator Kennedy's correspondence was a letter written by DMR Commissioner Morrissey dated September 18, 2001. The content of Commissioner Morrissey's letter was in response to a congressional inquiry that Senator Kennedy's office made on behalf of Mr. Glover relating to this matter.

**75.** Noted from Commissioner Morrissey's letter: 'Please be assured that Mr. Glover's concerns have been relayed to the Department as well. His allegations were investigated and an appeal was filed. Mr. Glover was given sufficient time to supply facts to bolster his claims. A 30-page appeal decision was handed down. Part of that decision reaffirmed some of Mr. Glover's contentions, but the majority were not substantiated. If Mr. Glover's gives your office permission, we would be more than willing to share the results of the appeal with you. You should be aware that the Massachusetts Governor's Commission on Mental Retardation was also contacted by Mr. Glover, and our legal staff shared the appeal with them to their satisfaction.'

**76.** On November 30, 2001, Mr. Glover then received a letter written by DMR Deputy General Counsel Mr. Peter Morin dated November 29, 2001. This correspondence was in response to the information provided to the office of former Acting Governor Jane Swift as noted in paragraphs 71-72; as well as to the DMR Springfield and Boston offices as noted in paragraph 60. Noted from Mr. Morin's letter: 'Please be advised that both the Governor's Office and Gerald J. Morrissey, Jr., Commissioner of the Department of Mental Retardation, have directed me to respond to your recent correspondence. Please be assured that all your submissions have been carefully reviewed. Commissioner Morrissey accepted the appeal report's findings and notified you of this outcome on or about January 25, 2001. Your correspondence has resulted in this appeal report being reviewed by Barbara Mazella, Administrator of the Governor's Commission on Mental Retardation. Ms. Mazella found that the appeal report was fair and thorough.'

77.    These specific letters compiled by both Commissioner Morrissey and Attorney
Morin and the references made about the GCMR having reviewed this specific appeal
and finding its conclusions fair and thorough directly conflict with factual
information as noted in paragraphs 61-67.

78.    After receiving these correspondences, Mr. Glover contacted Senator Kennedy's
Constituent Services staff about these newly discovered discrepancies as noted in
paragraphs 74-77 seeking additional assistance. Since this time, Mr. Glover has
provided a copy of this informal rebuttal as noted in paragraph 60; as well as mailing
other documentation to the office of Senator Kennedy having relevance in these
matters.

79.    Follow up information relating to paragraphs 74-77 was provided to the House
Post Audit and Oversight Committee/Bureau, the Joint Committee on Human
Services and Elderly Affairs, the office of former Acting Governor Jane Swift, and
the GCMR on specific days throughout December 2001 as well.

80.    On December 4 and 6, 2001, Mr. Glover sent correspondences to DMR Deputy
General Counsel Morin regarding information cited in paragraphs 74-77. Mr. Glover
requested to Mr. Morin that he provide a copy of this specific appeal report to the
office of Senator Kennedy allowing further review.

81.     Due to the misleading information contained in the letters as noted in paragraphs 75-77, Mr. Glover brought this new matter to the attention of Ms. Mazella of the GCMR on November 30, 2001 and December 4, 2001, respectfully. Mr. Glover received a response from the GCMR on December 11, 2001. Noted from Ms. Mazella's letter: 'I have received and reviewed your correspondence dated November 30, 2001 and December 4, 2001. As I previously stated, our enabling executive order prohibits our commission from conducting inquires into "statues or regulations governing abuse or neglect of persons with mental retardation." In addition, our mandate prohibits our commission from considering "matters for which there exist another mechanism instituted by law."

82.     On December 6, 2001, Mr. Glover provided follow up correspondence to DPPC Deputy General Counsel Ms. Quinn relating to information as noted in paragraph 59 repeatedly requesting the DPPC perform a quality review of these investigations and appeal report pursuant to Mass Gen. Laws 19C-sections 3, 5, 9 and 11.

83.    On December 17, 2001, Mr. Glover received a reply from Ms. Quinn denying his request. Noted from Ms. Quinn's letter: ''From the numerous reviews of the cases in which you were involved in some capacity, it has been determined, and affirmed on your appeal to the Department of Mental Retardation, that the provisions of each of these sections of the statute were complied with. The DPPC Executive Director reviewed the issues again upon receipt of your previous request for a Commissioner's Investigation, and concluded that these issues had been properly dealt with through the appeals process. No new information is presented in your correspondence to alter that view. Therefore, the Executive Director declines to further review this matter and has again determined that this matter is not appropriate for a Commissioner's Review. The Disabled Persons Protection believes that these cases have been thoroughly, fairly, and fully investigated and reviewed for appeal and reconsideration.'

84.    On December 20, 2002, Mr. Glover sent via fax transmission, a reply to Ms. Quinn regarding the information noted in paragraph 83.

85.    On January 25, 2002, Mr. Glover mailed information, via signature confirmation, to the Executive office of Massachusetts' Secretary of Health and Human Services, Mr. Robert Gittens. Included with this material was documentation indicating numerous descrepancies and mistaken conclusions surrounding these mishandled investigations and the appeal report conducted by the DMR. On January 28, 2002, a representative from this office, a 'J. Reynolds' received the information mailed by Mr. Glover.

86.    Mr. Glover never received a response from the office of former Secretary Gittens regarding the information as noted in paragraph 85.

87.     On January 29, 2002, Mr. Glover received a response from Massachusetts Senate Minority Leader Brian Lees regarding previous information provided to Senator Lees and House bill, entitled, 4644, "An Order Relative to Authorizing the Committee on Human Services and Elderly Affairs to Make an Investigation and Study of Certain Senate and House Documents Concerning Disability Services." Noted from Senator Lees' letter: 'I appreciate learning your thoughts on this significant legislation and I understand your frustration with the Investigation Unit of the Department of Mental Retardation.'

88.     On January 31, 2002, Mr. Glover faxed documentation to Ms. Caroline Chang of the Office of Civil Rights (hereinafter referred to as OCR) at the United States Federal Department of Health and Human Services (hereinafter referred to as HHS) Region I office in Boston. A folder of additional information was mailed, via signature confirmation, to Ms. Chang on this same day as well. On February 1, 2002, Ms. Kesha Edwards, a representative from the OCR, contacted Mr. Glover to discuss these matters. Mr. Glover and Ms. Edwards discussed the possibility of having the OCR/HHS explore these investigative practices carried out by the DMR in reference to following federal procedural guidelines involving abuse and mistreatment investigations since the DMR receives federal funding from HHS.

89.     Mr. Glover informed Ms. Edwards that her office would receive additional material within the next few days. Furthermore, Mr. Glover informed this representative from the OCR that because of the way these investigations and appeal had been mishandled by employees of the DMR, legal violations had transpired.

90.    On February 20, 2002, through the recommendation of both Senator Lees and the office of Senator Kennedy, Mr. Glover contacted the office of Massachusetts State Senator Stephen Brewer. Later that same night, Mr. Glover met with Mr. John Cournoyer (from Senator Brewer's office) in Belchertown, MA during 'town hours' allowed for constituents from the specific districts represented by Senator Brewer. Mr. Glover provided Mr. Cournoyer a packet of information, which indicated the DMR had mishandled these specific investigations and appeal report.

91.    On February 27, 2002, Senator Brewer sent letters and documentation, on Mr. Glover's behalf, directly to Acting Governor Swift and DMR Commissioner Morrissey. Noted from Senator Brewer's letters: 'I would greatly appreciate if you would review the enclosed documentation at your convenience, and consider any options that Mr. Glover may have in this regard. I would also appreciate if you would contact Mr. Glover directly with any information that becomes available, and please send me a copy of any correspondence you may have with him in this regard.'

92.     On March 14, 2002, DMR Commissioner Morrissey replied to Senator Brewer about the information in paragraph 91. Noted from Commissioner Morrissey's letter: 'Thank you for your letter on behalf of your constituent JT Glover. Please be assured that the materials you forwarded me will be given careful review. I have also included a letter to Mr. Glover from Deputy General Counsel Peter Morin, which I hope demonstrates that Mr. Glover's concerns have been fairly and fully considered.'

93.     On March 6, 2002, Mr. Glover received a letter from HHS Regional Manager of the OCR, Ms. Chang. Noted from her letter: 'You also raise concerns regarding the Massachusetts Department of Mental Retardation investigation of these allegations. This letter is to advise you that OCR is unable to assist you. Allegations of abuse are handled by HHS' Centers for Medicare and Medicaid Services. Therefore we have closed your complaint and referred it to the office listed below for possible handling' (Centers for Medicare and Medicaid).

94.     On March 11, 2002, Mr. Glover provided a follow up letter, via facsimile transmission, to Senator Kennedy at his Washington DC office in reference to the information cited in paragraph 93.

95.    On Thursday, June 13, 2002, Christian, a staff member from Senator Kennedy's constituent services, contacted Mr. Glover regarding this matter. Subsequently, on June 18, 2002, Mr. Glover provided a summation to this person about previous correspondences sent to Senator Kennedy's office. Christian followed up with Mr. Glover by leaving a message on his answering machine requesting that 'he contact Senator Kennedy's office with information about whom he contacted with HHS in Boston, what documents Mr. Glover had provided this office, and if he could fax these same documents to Senator Kennedy's office as well.' On June 20, 2002, Mr. Glover faxed this requested information to Senator Kennedy's office.

96.    On June 20, 2002, Christian, from Senator Kennedy's office again contacted Mr. Glover. Noted are excerpts from this second message left by this staff member on Mr. Glover's answering machine: 'We feel we have a sufficient amount of information on your case, we're trying to see what best and most expedient way to handle your issue is…and we appreciate your diligence.'

97.    On July 25, 2002, Senator Kennedy provided Mr. Glover with a letter indicating his office conducted a congressional inquiry into these matters with the Federal Department of HHS Region I office in Boston. Enclosed with the Senator's letter was correspondence dated July 15, 2002 written by Mr. Ronald Preston, former Associate Regional Administrator of the Centers for Medicare and Medicaid Services.

98.    Noted is the following excerpt from Mr. Preston's letter: 'We will be happy to review any additional information in this case if it contains specific allegations regarding the maltreatment of any Medicaid recipients by DMR or its contractors or their misuse of federal funds. Furthermore, our sister agency, the Office of Civil Rights, has authority to investigate any allegation of discrimination on the basis of disability (and certain other factors) in programs and activities receiving federal financial assistance from the Department of Health and Human Services.'

99.    On October 17, 2002, Mr. Glover conferred with specific staff members from Senator Kennedy's constituent services. During this conference call, Mr. Glover learned that the office of HHS was choosing not to explore these systemic problems facing the Division of Investigations of the DMR and these matters didn't hold appropriate merit for further review by HHS. On October 23, 2002, Mr. Glover faxed letters directly to Mr. Preston, and Mr. Brian Cresta, Regional Representative of HHS requesting to learn, in more detail, why HHS felt that the DMR mishandling of these specific investigations didn't require further investigation. Mr. Glover never received a response from either Mr. Preston or Mr. Cresta.

100.    On October 9, 2002, Senator Brewer sent a letter and enclosed documentation referring these matters to Attorney General Thomas Reilly. Noted from Senator Brewer's letter: ' I would appreciate if you would review the enclosed documentation at your earliest convenience, and please consider any options that may be available to Mr. Glover. In addition, I would also appreciate if you would contact Mr. Glover directly with any developments that may occur relative to this matter.'

101.    On October 29, 2002, Mr. Glover received a letter from Senator Brewer notifying him that the Senator's office received a reply from the Attorney Generals office which contained information similar to what is stated in paragraph 70.

102.    On October 31, 2002, Mr. Glover sent an introductory statement regarding these matters to the office of candidate for Massachusetts Governor Mr. Mitt Romney. Mr. Glover's reasoning was because one of Mr. Romney's campaign issues was stressing the need to restructure the current state of Health and Human Service agencies operating in the Commonwealth.

103.    On November 1, 2002, Mr. Glover received a reply from Candidate Romney. Noted from this letter: 'Thank you for your letter and the information you sent. As you mentioned, we are in the final days of the campaign, and thus are quite focused on victory. If I am fortunate enough to become Governor, I look forward to researching all feasible ways of improving our state's Health and Human Services agencies.'

104.    In January 2003, Mr. Preston, the individual noted in paragraphs 97-99, was appointed by then Governor-elect Romney to serve as his Secretary of the Executive Office of Health and Human Services for the Commonwealth of Massachusetts. Because Mr. Preston's new duties entailed overseeing the DMR; on January 8, 2003, Mr. Glover provided a cover letter and a packet of information, via delivery confirmation, to Mr. Preston regarding these longstanding concerns relating the DMR mishandling specific abuse and mistreatment investigations and the appeal report.

105.    On February 25, 2003, Mr. Kevin Hall, New England Director for the Citizens
Commission on Human Rights submitted a one-page report to Attorney Ralph
Calderaro of the DPPC citing evidence that the DMR mishandled the investigation by
Mr. Comerford and the appeal report by Ms. Nicholson (note enclosure #1).

106.    Note content from the cover letter Mr. Hall wrote Mr. Glover when providing him
a copy of his report submitted to the DPPC: 'Thank you for your courage and
persistence in trying to protect the clients of the Department of Mental Retardation
from internal abuse.'

107.    On April 9, 2003, Mr. Glover provided faxed correspondences to DMR
Springfield and Boston, and included Mr. Hall's letter and report as noted in
paragraphs 104-105. This material was also forwarded to the Office of the Attorney
General and the Office of Governor Mitt Romney on this day as well.

108.    On May 16, 2003, Mr. Glover received a reply from Attorney Calderaro of the
DPPC in reference to information contained in paragraph 104. Noted from Attorney
Calderaro's letter: 'I am in receipt of both the correspondences from Mr. Hall and
yourself regarding your concerns involving DPPC cases #32022, 32045, 32099 and
32100. I have been and am continuing to review the concerns enunciated in both of
these letters. Because of the variety of demands on my time, admittedly my progress
has been slower that I had hoped. However, I did want you to know that your
expressed concerns are not being ignored and that as soon as I have completed my
review of these matters I will notify both you and Mr. Hall of any conclusions that I
reach.'

109.    Mr. Glover sent a reply to Attorney Calderaro, via fax transmission, on May 23, 2003.

110.    On May 23, 2003, Mr. Glover received additional correspondence from Attorney Morin of the DMR in reference the information he faxed to DMR Boston on April 9, 2003 as noted in paragraph 106. Noted from Attorney Morin's letter: 'The Department of Mental Retardation devoted significant resources to your appeal. It is the Department's position that your appeal was thoroughly and fairly considered. All inquiries brought on your behalf by the offices of former Governor Swift, the Governor's Commission on Mental Retardation and Senator Kennedy have been responded to in an open and cooperative manner. Upon review of the materials provided them each of the aforementioned offices have indicated their satisfaction with the Department's actions.'

111.    Given the additional misleading information contained in the letter cited in paragraph 109, Mr. Glover sent a reply, via fax transmission, directly to Mr. Morin on May 27, 2003. Several conversations were held between representatives from the offices cited in paragraph 109 and Mr. Glover. During these phone conferences, no one ever indicated to Mr. Glover 'their satisfaction with the Department's actions' regarding the mishandling of these investigations.

### III. Closing Statement

1.     Since I am representing myself on a pro-se basis, I assure the US District Court

that I will continue researching all of the necessary information allowing me to

proceed forward with these matters. More importantly, because of these

circumstances, and other mishandled investigations conducted by the DMR in the last

ten years, I firmly believe this agency's Division of Investigations is rifled with

numerous flaws requiring further inquiry. It is my hope necessary improvements may

be instituted in the investigative practices being carried out by the DMR.

**IV. Causes of Action:**

**Count I. 42 USC Section 1983: Civil Action for the deprivation of Rights**

1.    The acts or omissions of specific individuals affiliated with the Department of

Mental Retardation initiated on April 27, 2000, (which these acts and omissions were

first discovered on October 6, 2000 and thereafter) were intentional.

2.    Specific individuals affiliated with the Department of Mental Retardation acted

under the color of state law.

3.    The actions or omissions of specific individuals affiliated with the Department of

Mental Retardation were the [proximate] [legal] cause of the deprivation of the

plaintiff's, Mr. JT Glover III, rights protected by the Constitution [or laws] of the

United States.

# Citizens Commission on Human Rights®
## 1112 Boylston Street, PMB 213
## Boston, MA 02215
## (617) 927-CCHR

JT Glover III
46 Quincy Street, #5
North Adams, MA 01247


February 25, 2003


Dear Mr Glover.

Attached is my report to Disabled Persons Protection Commission regarding your report of abuse to a DMR client at the Berkshire Family And Individual Resources, Inc.

Thank you for your courage and persistence in trying to protect the clients of the Department of Mental Retardation from internal abuse.

Please feel free to use this letter and the statement to DPPC as you see fit.


Sincerely,

Kevin Hall
New England Director


*CCHR was established in 1969 by the Church of Scientology to investigate and expose psychiatric violations of human rights*

# Citizens Commission on Human Rights®

*1112 Boylston Street, PMB 213*
*Boston, MA 02215*
*(617) 927-CCHR*

Attorney Ralph Calderaro
Disabled Persons Protection Commission
59 Ross Way
Quincy, MA 02169                                               February 25, 2003

Dear Attorney Calderaro:

Attached is a case I believe you are aware of that shows a necessity for investigations to be done fully outside the realm of the Department of Mental Retardation by an agency such as yours.

The case is one where a former employee of a DMR contractor who reported abuse, has documentation that abuse of a client occurred and DMR dismissed this case as unsubstantiated despite evidence such as incident reports occurring on the shift of the abusive staff member, medical records showing injury to the DMR client and corroborating testimony

This evidence is all attached in the DMR Senior Appeals Officer, Pamela Nicholson, report, despite her conclusions and recommendations statement that, "The weight of evidence does not support a conclusion that Staffperson C abused or mistreated the individual's in his care "

The following are attached:
1. Cover page and conclusions and recommendations page 29,
2. Page 24 and 25 incident reports.
3. Page 25 last paragraph and page 26, first two paragraphs stating a pattern of suspicious incident reports and that they weren't followed up upon by the house manager.
4. Page 28, 2nd paragraph states that "the injuries could be traced to a time when the individual was in the care of Staffperson C and that Staffperson C had failed to properly document the circumstances of each injury.
5. Page 14 (last paragraph) and page 15 (first two paragraphs) give corroborating statements of abuse and intimidation of patients against Staffperson C by former Staffperson M.
6. Page 20 (bullets section) states that DMR Investigator Harry Comerford reported that:
   a. that Staffperson M indicated that he did not witness Staffperson C mistreat the clients (this statement is proven false by pages 14 and 15), and
   b. that there was an absence of a pattern of injuries or incidents when Staffperson C worked with Individual S in DMR Incident Reports (this statement is proven false by pages 24, 25, 26 and 28).
7. Page 7 and 8 allegations of abuse by reporter JT Glover against Staffperson C (Steve Conlin) against Individual S, a client at Berkshire Family And Individual Resources, Inc. (BFAIR).

From what I understand, Glover was fired, Conlin was employed at the BFAIR residential home another year The whistleblower is fired, the abuser kept on and the case is kept quiet which protects the PR of DMR and its private contractor while the client is kept in an abusive environment.

Sincerely,

Kevin Hall
New England Director