UNITED STATES DISTRICT COURT
DISTRICT FOR MASSACHUSETTS

KEVIN W. TOBIN,
    Plaintiff

v. ROBERT NADEAU
KEVIN VANCE and
MANINA SCHWITTERS,
    Defendants

Civil Action No. 03CV11817DPW

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO REMAND ACTION TO PLYMOUTH SUPERIOR COURT

### FACTUAL AND PROCEDURAL BACKGROUND

The following facts are pleaded in the plaintiff's complaint: Kevin W. Tobin, the plaintiff, was employed starting in the 1960's for over thirty years as an insurance sales representative by Liberty Mutual Insurance Group. Sometime in the 1990's Mr. Tobin was diagnosed as a bipolar manic.

Due to the nature of Tobin's disability, during periods of time when he was subjected to extreme stress and pressure, it was very difficult for him to perform tasks he could otherwise easily perform. This fact was known by the defendants who worked at Liberty Mutual as his direct supervisor, the supervisor of his direct supervisor and a human resources director. The defendants conspired to take actions intended to increase the stress and pressure on Tobin in order to

1

make him less effective at performing his duties in order to effectuate the termination of his employment by Liberty Mutual.

Due to his disability and the stress and pressure on him caused by the actions of the defendants, Tobin required reasonable accommodations from his employer in order to perform the duties required of him as a sales representative. The accommodations required by Tobin from his employer included adequate administrative assistance to service Tobin's book of business and reasonable opportunities to sell insurance.

At sometime unknown to Tobin, the defendants conspired to build a case to justify the termination of the employment of Mr. Tobin from Liberty Mutual. A series of events followed, orchestrated by defendant Robert Nadeau, which were intended to unfairly and inaccurately discredit Tobin in the eyes of his employer. Defendant Kevin Vance and defendant Manina Schwitters participated in this process. The defendants conspired to deny said accommodations to Tobin. The defendants had actual knowledge of Tobin's disability. The defendants had actual knowledge of the effect of said disability and the effect of extreme stress and pressure on Tobin's performance as a sales representative. The defendants conspired to withhold from senior management at Liberty Mutual the fact that Tobin's work performance was materially affected by said disability. The defendants conspired to withhold from senior management at Liberty Mutual the fact that Tobin required reasonable accommodations in order to perform the duties of his position and, in fact, willfully misrepresented to said senior management that Tobin had been given fair opportunity and reasonable

2

administrative support, when, in fact, they knew that said representations were not true. Said actions were intended to effectuate the dismissal of Tobin from his employment at Liberty Mutual by securing the approval of his discharge by senior management.

At various times the defendants characterized Tobin, in communications with other management and human resource administrators at Liberty Mutual, as being "high maintenance" and/or generally incompetent.

Due to the actions of the defendants, the plaintiff was, in fact, discharged by his employer on or about January 10, 2001.

The present suit seeks damages from the defendants for intentional and negligent infliction of emotional distress and for intentional interference with contractual relationships.

The plaintiff previously filed a lawsuit against his former employer for, *inter alia*, handicap discrimination, age discrimination and wrongful termination. Said action is pending in Federal District Court (Kevin W. Tobin v. Liberty Mutual Insurance Company, Civil Action No. 01-11979 DPW). The actions of the defendants in the instant case first became apparent to the plaintiff only during the discovery phase in the action against his former employer. During the course of said discovery, the plaintiff became aware for the first time of memoranda of the defendants which clearly support the claims being advanced. There of these memoranda are attached hereto as Exhibits A-C. The instant complaint was filed in Massachusetts Superior Court, Plymouth County, on or about August 22, 2003. The defendants sought removal of the action on September 19, 2003

3

purportedly based on federal question jurisdiction, namely ERISA. The plaintiff contends that there is no federal question raised in his complaint and seeks remand of the action to Plymouth Superior Court.

## ARGUMENT

The party seeking to invoke the removal statute has the burden of establishing the existence of federal jurisdiction. Holcomb v. Bingham Toyota, 871 F. 2d 109 (9th Cir. 1989). Where there is any doubt as to removal of a matter to federal court, the ambiguity is resolved against removal. Butler v. Polk, 592 F.2d 1293 (5th Cir. 1979). The fact that a related case is pending in federal court does not in and of itself provide sufficient grounds for removal of a related state court action. Fabricius v. Freeman, 466 F.2d 689 (7th Cir. 1972). In order to warrant removal, the federal controversy that forms the basis for federal jurisdiction must be on face of the plaintiff's complaint. Zimmerman v. Conrail, 550 F. Supp. 84 (D.C.N.Y. 1982).

In Toumajian v. Frailey, 135 F.3d 648 (9th Cir. 1998), the plaintiff brought suit alleging that accountants were negligent in establishing and administering his pension plan. Defendants removed the matter to federal court based on a claim of ERISA. The Appeals Court remanded the matter to state Court and awarded sanctions ruling, in part, that the claim was not completely pre-empted as the claim fell outside of ERISA's civil enforcement provision.

In Wood v. Vermont Insurance Management, Inc., 749 F. Supp. 558 (D.Vt.1990), the plaintiff sued her employer, *inter alia*, for emotional distress, sexual discrimination and wrongful discharge. Defendants sought to remove the

4

action to federal district court. The Court held that federal jurisdiction was absent and awarded costs to the plaintiffs.

In <u>Crespo v. Candela Laser Corp.</u>, 780 F. Supp 866 (D. Mass. 1992), the plaintiff brought a breach of contract suit in state court against his employer for recovery of employee severance benefits. The employer removed the matter to federal court alleging that ERISA applied. The federal court *sua sponte* remanded the matter to the state court and found no federal jurisdiction.

In <u>Crespo</u>, Judge Young first noted:

> "Some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." <u>Parisi, 711 F. Supp. at 61</u> (citing <u>Shaw, 463 U.S. at 100 n. 21</u>). See, e.g., <u>Jervis v. Elerding, 504 F. Supp. 606 (C.D. Cal. 1980)</u> (dismissing for lack of subject matter jurisdiction a claim for post-termination retirement benefits, and distinguishing between an employer promise, as part of a written employment agreement, to pay certain covered benefits and a "plan" for paying benefits).

Judge Young further noted:

> [The defendant] confuses preemption with removal jurisdiction; the latter must be established before the former may be addressed. [The defendant] has thus "put the cart before the horse, for it is only after this Court's removal jurisdiction is established that it can address the merits of the preemption controversy." <u>Austin v. New England Tel. & Tel. Co., 644 F. Supp. 763, 765 (D. Mass. 1986)</u>. Austin rejected the similar argument of a defendant and remanded the state law claim, citing <u>Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust for Southern California, 463 U.S. 1, 7, 77 L. Ed. 2d 420, 103 S. Ct. 2841 (1983)</u>.

Judge Young concluded:

5

> "Quite clearly, there must be a point beyond which ERISA was not designed to reach." <u>Totton v. New York Life Insurance Co., 685 F. Supp. 27, 30 (D.Conn. 1987)</u> (citing <u>Morningstar v. Meijer, Inc., 662 F. Supp. 555</u> [E.D. Mich. 1987]). Though this Court ...concludes that holding for [the defendant] here would permit removal upon even the most conclusory allegations of employer benefits, thereby unnecessarily involving the federal courts in claims that stretch ERISA preemption beyond any conceivable purpose envisioned by Congress.

In the instant case, the claims of Mr. Tobin do not fall within the ambit of ERISA's civil enforcement provisions. The implication of ERISA is even more tenuous than in <u>Crespo</u> and in <u>Toumajian</u>. Defendants have sought removal to the federal court based on their contention that the complaint relates to an ERISA claim. The defendants suggest that the federal court has jurisdiction based on paragraphs 103-106, 109, 112-113, 115-117 and 140 of the complaint. (Defendants' Notice of Removal, ¶ 6). A reading of the complaint in no way supports the allegations made in the Notice or Removal. In fact, a literal reading of these paragraphs suggests that there is no reasonable basis for the defendants' Notice of Removal in the first place. The only reference in any of these paragraphs which remotely pertains to ERISA are the general statements that the plaintiff intended to apply for disability benefits and was discouraged from so doing by the defendants acting in bad faith. These paragraphs do not implicate ERISA sufficiently to maintain federal jurisdiction. In fact, these paragraphs do not suggest any issues of law which pertain to ERISA. The gravaman of the complaint pertains to a conspiracy by the defendants to discredit the plaintiff and cause the plaintiff to be wrongfully terminated because the defendants perceived

that the performance of the plaintiff negatively impacted upon the performance of the defendants. The employer is not a defendant in this action and no allegations are made in the complaint that any of the defendants violated ERISA provisions. Employee benefits are not at issue in the instant case. The matter is clearly a state court action for wilful infliction of emotional distress.

Even if ERISA does provide a defense to the defendants, which is vigorously disputed by the plaintiff, as a defense ERISA does not establish federal question jurisdiction. The instant case is beyond the point to which ERISA should reach. The Court should remand the action to Plymouth Superior Court and sanction the defendants for the frivolous attempt to remove this matter to the Court when there is clearly no federal jurisdiction.

Respectfully submitted,
KEVIN W. TOBIN
By his attorney,

Dated: October 17, 2003

_____
Frank J. Frisoli, Esq.
BBO #180440
Frisoli & Frisoli
797 Cambridge Street
Cambridge, MA 02141
617-354-2220

7

**Maloney, Robert**

NADEAU
EXHIBIT NO. 10
6/24/03
N. MALOOF

VANCE
EXHIBIT NO. 21
5/27/03
N. MALOOF

| | |
|---|---|
| From: | Nadeau, Robert |
| Sent: | Thursday, August 03, 2000 10:27 AM |
| To: | Maloney, Robert |
| Cc: | Vance, Kevin; Schwitters, Manina |
| Subject: | FW: Kevin Tobin- meeting on August 1 |

**Importance:** High

Hi Rob,

Kevin and I figure we've lost well over 300 man hours trying to help Kevin improve his performance, however it has not improved. Also he is a high maintenance rep for the employees in the Hingham office, and for his manager Nina. He continually has problems with meeting dates for training sessions ( ie CAW) , quarterly planners, etc... She had to spend over 2 hours with him this week trying to help him organize again this week. Meanwhile, that's 2 hours we lost training brand new reps who haven't been trained on procedures and products once, let alone over and over like Kevin has.

Today you'll be faxed four recent documents from Kevin's file. His file is extremely thick loaded with years of documented poor performance, several written warnings, probation periods, and poor behavior. Here's a snapshot of the 4 documents:

1. **May 10,1999 memo** This apparent final warning clearly states he needed to sell 276 policies by the end of the year, and average 78 polices per 13 week quarter which works out to a 6 per cap, the min. standard in Mass. He came in at 229 polices on the December IBM a full 47 policies short. Completely un-acceptable, not even close. Yet nothing happened.

2. **2000 marketing Plan** Done on January 11, this is completely his plan. It's not surprising to note he hasn't done the activities he said he would, nor has he come close to getting the results he said he would. Through June Kevin is 47 policies short of his plan.

3. **March 2000 Quarterly Planner** The first QP this year shows an un-acceptable result. The March IBM shows 47 polices versus the 78 he was required to have as of the May 10 final warning. (That number 47 keeps popping up?)

4. **June 2000 Quarterly Planner** The second QP of the year shows 44 policies (organizer) clearly an un-acceptable result again as outlined in Nina's August 1 meeting with Kevin.

**In the past, we have not been supported in taking any action what-so-ever with Kevin.** For example, a senior vp in home office had the regional sales mgr take Kevin completely off probation in 1996. Kevin's sales results were the worst in the command, and un-acceptable, however senior mgt took him off probation. Also I wasn't even supported on trying to suspend Kevin for one week after he blew-off a scheduled meeting with his manager in the fall of 1997. This was 5 days after he received a strongly worded written warning. (The 1.5 page letter with 35 revisions by Laura Williford) That warning clearly stated there would be consequences for missing another meeting. He got that letter after missing so many meetings with his manager. He had complete disregard for mgt. He had even directed obscenities at me. These are just some examples.

That brings us to today. What can we do? We've tried everything from encouragement, selling ideas, re-training using tools like the success guide, even the companies progressive discipline process. Literally nothing has worked. Field mgt and I feel uncomfortable trying to do anything. So we just try our best, and keep the quarterly planners documenting his poor results which are clearly communicated to Kevin on an on-going basis. Quarter after quarter, year after year.

We've tried weekly meetings, however they didn't really help because he doesn't apply what he's been taught. He also frequently skipped out on weekly meetings. That high maintenance approach places a severe strain on a manager who has so many other pressing responsibilities.

But here's the no win situation. We can not make our quotas with low producers like Kevin. I didn't get my usual high appraisal rating last year because I missed my quotas. Keeping a poor producer like Kevin sends a loud message to the field. You don't have to work hard, or follow mgt direction and nothing happens. It makes the sales mgrs job even harder when they have to try to motivate or push other reps.

At least 70% of our sales force are the middle performers. Everyday they look at their peer group, and are either pulled up by our top performers (15% of reps) or pulled down by low producers (10% of reps). I've heard reps say: "Why should I work so hard, I see this guy work a lot less, sell a lot less and make about the same money." Face it, you are what you see and hear. In these times of trying to raise our per-capitas, we hand-cuff managers with high quotas, yet don't support them with the progressive discipline process. It's a no win situation for managers.

Would you visit Kevin Tobin and get his perspective, then talk to Jim Masterson and our HR reps. Before Nina or I even think of doing anything with our progressive discipline process for Kevin's un-acceptable results, we need strong assurances we'll supported this time. Technically, he hasn't met his numbers, and has been on warning and probation

1

LM 02453

Exhibit A Page 2 of 2

several times. You're only supposed to be on probation once, he's clearly used up his chances over and over. Personally, I'd like to see Liberty work out some sort of a package for him.

Bob

-----Original Message-----
**From:** Schwitters, Manina
**Sent:** Thursday, August 03, 2000 8:24 AM
**To:** Nadeau, Robert; Vance, Kevin
**Subject:** Kevin Tobin- meeting on August 1
**Importance:** High

I have several concerns about my meeting with Kevin Tobin on August 1 in Hingham. My visit was a routine review of quarterly planners with the sales reps.

1. Kevin appeared heavy medicated and unable to focus on our discussion. He arrived in the office around 10:30, he just visited the doctor office and it took longer than he expected.

2. Before Kevin Tobin was in the office, I had a discussion with Laura Ashworth who was concerned about his messy desk. On the previous Friday they were trying to find a homeowner binder and were unable to help the customer because there was no record of information on his desk. Laura was also concerned about his notes and clutter in the workstation and the appearance of his workstation with customers coming in the office.

3. Kevin desk was completely covered with envelopes and brochures, incomplete applications, two boxes under his desk (stuff-phones books, brochures, etc.), a Xerox box top, posted notes everywhere on his bulletin boards and on his computer. The notes and paperwork were dated from the present back to May. His chair was covered with registry screens and more paperwork. The empty desk next to his had more registry screens and print-outs.

With Kevin I proceeded to review and remove the clutter and paper that had no relevance, this process over one hour. He had old expirations for next year and follow-up. Old quotes that he intended to follow-up next year. Some old service work which I immediately gave to Eileen Goldie to process. (ie:remove a car) I then gave him a rolodex for his post-note phone numbers and this removed three quarters of the paper notes from the wall area. We ordered two stand up files so he did not need a second desk for his paperwork. There was one application with a check which I insisted he complete so it could be processed.

Then, we met regarding his quarterly planner. His reason for poor performance this year was there was too much service and he did not get any help. And his back-up service rep Eileen was too busy. So I stopped the meeting and asked Laura Ashworth(service manager) to join us. Laura then reiterated that Kevin not only has Eileen but Tammi and Nancy plus everyone in the service team whenever he needs assistance. Also, to come to Laura whenever he needs service assistance. She then proceeded to tell Kevin that the service reps would appreciate him doing less service and pass the calls immediately to them. Because this creates more work and wastes the customers time.

So I had Kevin agreed to this streamlining of service problems along with claims calls should go to claims and so on. However, my concern is that he forgets, perhaps due to the medication, I am not sure. We have been over this with Kevin several times(for eight years according to Laura). Kevin said he has always been heavily involved with service and claims. I asked him too please pass the service and claims issues to the reps so the customer would get the best service we can possible give in a timely(immediate) fashion. Once again stressing the information on his desk was way over due and the best thing to do is to pass it on to be completed.

Please see quarterly planner for more information.

*Nina Schwitters*
Personal Sales Manager
South Easton, MA
1-800-442-8150 X110
fax (508) 238-5918
sdn 8-434-2110

2

LM 02454

### Message for Robin-Michael

**From:** EXCH01.NADEAUR1

**Date:** Tue, Oct 28, 1997 9:13 AM

**Subject:** RE: Kevin Tobin meeting

**To:** Robin-Michael

NADEAU
EXHIBIT NO. 18
N. MALOOF

ROBIN
EXHIBIT NO. 18
4/7/03
N. MALOOF

Keep your head just like you have been. This guy is really doing you and me a favor pulling these unacceptable stunts.

-----Original Message-----
From: ROBIN, MICHAEL
Sent: Friday, October 24, 1997 3:28 PM
To: *Vance-Kevin
Cc: Nadeau, Robert
Subject: Kevin Tobin meeting

I scheduled a meeting with Kevin Tobin for noon today. I was VERY specific as to the time we were meeting due to the previous incidents we have had.

By 12:35 when he had not shown up at my office (nor called-- he has a cell phone in his car), I left for lunch. When I returned to the office at 1:55, he poked his head in my office and said "I'm here". I said to him that I did not not have time to meet with him as I had a 2:30 appointment out of the office. He said that he didn't think that showing up after 12:30 was really any problem as "we planned to spend a couple of hours together". I told him that I felt it was unprofessional to show up more than a half hour late to a meeting without calling. I said that I hoped he wouldn't do it to a customer; and that he certainly shouldn't do it to me given his track record of punctuality. He replied that "I alway schedule my appointments for between 6:30 and 7:00, and like that". I told him that that is not how I schedule MY appointments and that I had been specific about meeting at noon.

He apologized for being late and said he has been working hard. I'm not sure that fact is accurately reflected in his 4 sales last week and 2 sales this week.

He then asked when we would get together next week and I said I'd get back to him with a time when I was available. I'm writing him a memo outlining the fact that I expect him to be on time for all meetings and that he faces disciplinary action if he does not adhere to this. I'll run it by you before I give it to him.

Mike

LM 03802

### Message for Robin-Michael

| | |
|---|---|
| From: | EXCH01.NADEAUR1 |
| Date: | Tue, Sep 23, 1997 10:07 PM |
| Subject: | RE: Kevin Tobin |
| To: | Robin-Michael |



we can't alter business cards. you could do a portfolio page....some bullets about liberty mutual and a short bio on kevin.

we've stop the co-op stuff for advertising. but because its kevin, I want to look like we tried everything to help so I'll approve a coop ad for up to $200. 100 from liberty, and 100 from him.

-----Original Message-----
From: ROBIN, MICHAEL
Sent: Tuesday, September 23, 1997 4:29 PM
To: Nadeau, Robert
Subject: Kevin Tobin


Bob, during my review with Kevin Tobin today, he felt very strongly that it would help his sales results to be able to list the fact that he is a member of Liberty's "Quarter Century Club" on his business cards. He first asked about Senior Sales Rep, but it seems the qualification of meeting Liberty Leader's standards once for every five years of service is a bit of a problem. By my math, he couldn't qualify for Senior Sales Rep before 2004. Kevin's point is that he feels it would buy him a lot more credibility with prospective customers if they knew of his longevity with Liberty.

As we reviewed section 3 (Prospecting) of the Success Guide, he also wanted to know if we would co-op the "Dare To Compare" or a similar ad for his local newspaper. I would suggest we do this as it is in the Success Guide and I have worked out a very specific prospecting program that he has agreed to. I'll send you a copy.

As I am in the middle of a large write up to Kevin Vance and a major concern to HR is all of the things we have done to both help and accomodate Mr. Tobin, I think we should consider giving him a positive answer on these requests if we are able.   Mike

LM 03831