UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

CIVIL ACTION NO. 03CV11633 MAP

| | |
|---|---|
| JT GLOVER, III, pro se | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| REPRESENTATIVES AFFILIATED | ) |
| WITH THE MASSACHUSETTS | ) |
| DEPARTMENT OF MENTAL | ) |
| RETARDATION-WESTERN MASS | ) |
| REGIONAL OFFICES: | ) |
| MR. GERALD MORRISSEY | ) |
| MR. PETER MORIN | ) |
| MR. BERNARD MURPHY | ) |
| MS. PAM NICHOLSON | ) |
| MR. LARRY TUMMINO | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT

The Attorney General, on behalf of all named defendants, who were employees with the Commonwealth Department of Mental Retardation during the period alleged (collectively referred to as "Commonwealth defendants"), and pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 56, submits this memorandum of law in support of the motion to dismiss the amended complaint or, alternatively, for summary judgment.[1]

---

[1] Glover has filed a motion with this court to consolidate an identical case, except for the difference in the named defendants, with this action. The other case, which was originally filed in the Western Division of this Court is captioned Glover v. Comerford, et al., 03 CV 30213 KPN. A similar motion to dismiss was filed in that case. The defendants in that case (Harry Comerford, Rick Huntington, Teresa O'Hare, and Steven Williams) are discussed below as

## STATEMENT OF RELEVANT FACTS AS ALLEGED

### Background and Summary of Alleged Claim

The pro se plaintiff, JT Glover III, brings this action, asserting a single cause of action under 42 U.S.C. § 1983 for the alleged deprivation of "rights protected by the Constitution [or laws] of the United States." Amended Complaint, § IV, Causes of Action. Glover claims that he has been denied his constitutional right to petition. He seeks damages in the amount of $200,000.00. Amended Complaint, cover page.

This matter arose after Glover "confronted" a co-worker, Steven Conlon, while they were employed with Berkshire Family and Individual Resources, Inc. ("BFAIR") on July 11, 1999, close to four and one-half years ago.[2] The confrontation purportedly concerned Conlon's "long-term maltreatment towards residents born with developmental disabilities" in the group home where they worked in Williamstown, MA. Id. at §§ I and II, ¶ 1 and § II, ¶ 9, 13. The confrontation ultimately led to Glover's termination on July 13, 1999. Amended Complaint, §§ I and II, ¶ 1.

Immediately after the confrontation, Conlon lodged a complaint with the Massachusetts Disabled Persons Protective Commission ("DPPC") regarding the confrontation and its impact on residents of the home. An investigation ensued. Id. at 15, 23, 24, 29, 30.

Glover responded to this investigation of his conduct by lodging his own complaint, approximately one week after his termination, on July 18-20, 1999. According to Glover, he

---

"defendants" given that the two cases are identical.

[2] For purposes of this motion only, the Commonwealth defendants will, as they must, assume all facts alleged by Glover are true.

"commenced reporting these longstanding acts of abuse and mistreatment regarding his former coworker [Conlon] to the [DPPC] pursuant to Massachusetts General Laws 19C" on behalf of two residents. Id. § I, ¶ 2, § II, ¶ 13-14. DPPC allegedly conducted an investigation "pursuant to 115 CMR 9.00" and assigned the investigation to employees with the Commonwealth Department of Mental Retardation ("DMR"). Id.

Glover's amended complaint in this case arises out of his "concerns involving the [employees with DMR who conducted the investigation] because of their individual participation in the mishandling of these specific investigations." Id. at § I, ¶ 3, 4, 5. Glover adds that these individuals "mishandled these investigations, and on a repeated basis, engaged in a pattern of activity, interfering with Mr. Glover's rights of petitioning various governmental offices to redress these grievances. Id. at § I, ¶ 5. Thus, he is attempting to "redress these mishandled investigations/appeal report by initiating these civil legal proceedings." Id. at § I, ¶ 6.

The defendants' conduct of which Glover complains is summarized below.

### Summary of Glover's Allegations Concerning The Defendants

On July 21, 1999, immediately following Glover's report, DPPC assigned a DMR investigator (Jeffrey Paymen), and he commenced his investigation by interviewing Glover that same day. Id. at ¶ 14. Glover provided numerous contacts who purportedly had information and materials relative to his complaint. Id. at ¶¶ 14-26.

Glover reached out to DMR officials other than Paymen. He also expressed his concerns related to the investigation concerning him (Glover) to defendant Rick Huntington, DMR Berkshire Area Director. Id. at ¶ 26. Huntington suggested that if Glover were concerned, he should contact Maureen Kirk, an investigations supervisor. Id.

In October 1999, investigator Paymen purportedly reported his notes and findings. Id. at ¶¶ 28-30. Paymen supposedly found against Glover, stating: "There is reason to accept the interpretation that the allegations (Mr. Glover's) were knowingly filed in a false and misleading manner as retaliation against the accused employee for a DPPC complaint he (Staff person Conlon's) had previously filed." Id. at ¶ 31.

After learning about Paymen's findings against him, Glover contacted Paymen directly and provided him and several DMR officials with additional materials. He cited evidence that Paymen and the investigations department had "mishandled these specific investigations." Id. at ¶¶ 32-33. He also "filed an appeal directly to DMR Commissioner Mr. Gerald J. Morrissey, Jr.," who is a named defendant. Id. at ¶ 31. Glover also sent an email to defendant Teresa O'Hare, a DMR Regional Director, requesting an "appeal investigation and meeting(s) to be held with various DMR employees allowing Mr. Glover the chance to redress these mishandled investigations." Id. at ¶ 34. O'Hare did not respond. Id.

DMR followed up on Glover's concerns, and on November 16, 1999, DMR investigators Paymen and Steven Williams met with Glover; the latter investigator is another named defendant. Id. at ¶¶ 35-36. They collected additional information from Glover and the witnesses to whom he referred them. Glover provided additional information to defendant Huntington (first identified above) and unsuccessfully attempted to meet with him again. Further, on November 22, 1999, another DMR investigator, defendant Harry T. Comerford, was assigned to conduct "a follow-up investigation." Id. at ¶ 35-37. Comerford followed-up initially by meeting with Glover in the presence of another DMR employee, Ms. Kirk. Id. at ¶ 38. Glover expressed his concerns with the Paymen/Williams investigation and provided additional information. Id. ¶¶

4

39-42. Comerford also conducted other interviews. Id. at ¶¶ 46-47.

On January 6, 2000, defendant investigator Williams "compiled an addendum" related to his follow-up investigation. Id. at ¶ 43.

Around this time, Glover apparently became unhappy with the progress and results of the ongoing investigation; on April 4, 2000, Glover allegedly threatened DMR with "legal action in an effort to redress these matters." Glover also provided additional information to DMR officials, including defendant O'Hare, who replied: "I have reviewed the email you sent me. I will be discussing with other involved parties next week and will reply after my discussions. Thank you." Id. at ¶ 45.

On April 27, 2000, defendants Comerford, Huntington, and Williams completed the "new investigative report." Id. at ¶ 48. Glover disagreed with many aspects of the report, stating: "Since this follow-up investigation was conducted and summarized in such a deceptive manner, the Division of Investigations of DMR Region I Springfield failed to appropriately redress these mishandled investigations initiated on July 20, 1999." Id. at ¶ 49. He added: "Additionally, because of the information included within this follow-up report, it appeared to retaliate against Mr. Glover's freedom of expression and activities in the manner it was conducted. Employees of DMR Springfield were aware of Mr. Glover's wishes to redress these accumulating grievances through legal proceedings three weeks before this investigation was completed on April 27, 2000." Id. at ¶ 50.

In the fall of 2000, "DMR Senior Appeals Officer, [defendant] Ms. Pamela Nicholson" heard Glover's appeal of the "mishandled investigations." Id. at ¶ 51. "Ms. Nicholson informed Mr. Glover that her responsibilities conducting this appeal existed independently from

the DMR and that she wanted to complete it in the most appropriate manner allowable" and she outlined the appeal process to him. Id. at ¶¶ 52-54. The "appeal was closed on January 25, 2001, without Ms. Nicholson further reinvestigating the additional discrepancies surrounding Mr. Comerford's investigation . . ." Id. at ¶ 54.

On January 29, 2001, Glover provided additional documentation to defendants "DMR Commissioner Mr. Morrissey and Deputy General Counsel, Mr. Peter Morin[, a defendant] . . ." Id. at ¶ 56. He did this to inform them of his "immense concerns relating to these specific investigations and how the appeal report being mishandled by the DMR" in addition to the "mistaken conclusions" in defendant Nicholson's appeal report. Id.

Glover also brought his concerns to Barbara Mazella of the Governor's Commission on Mental Retardation ("GCMR"). Id. at ¶¶ 61-62. Mazella looked into the matter and informed Glover that "Commissioner Morrissey has accepted the findings of the appeal officer and has sent you a letter indicating that decision. Your only option is to file a legal challenge in court and start legal proceedings." Id. at 67.

Glover also provided information to many politicians. Id. at 71-74. United States Senator Edward Kennedy allegedly inquired with DMR Commissioner Morrissey, who purportedly responded as follows:

> Please be assured that Mr. Glover's concerns have been relayed to the Department as well. His allegations were investigated and an appeal was filed. Mr. Glover was given sufficient time to supply facts to bolster his claims. A 30-page appeal decision was handed down. Part of that decision reaffirmed some of Mr. Glover's contentions, but the majority were not substantiated. If Mr. Glover gives your office permission, we would be more than willing to share the results of the appeal with you. You should be aware that the Massachusetts Governor's Commission on Mental Retardation was also contacted by Mr. Glover, and our legal staff shared the appeal with them to their satisfaction.

Id. at ¶ 75.

"DMR Deputy General Counsel Peter Morin" also responded to Glover, after he was purportedly contacted by various political figures. Id. at 76. He allegedly stated:

> Please be advised that both the Governor's Office and Gerald J. Morrissey, Jr., Commissioner of the Department of Mental Retardation, have directed me to respond to your recent correspondence. Please be assured that all your submissions have been carefully reviewed. Commissioner Morrissey accepted the appeal report's findings and notified you of the outcome on our about January 25, 2001. Your correspondence has resulted in this appeal report being reviewed by Barbara Mazella, Administrator of the Governor's Commission on Mental Retardation. Ms. Mazella found that the appeal report was fair and thorough."

Id.

Glover also purportedly requested DPPC General Counsel Quinn to "perform quality review of these investigations and appeal report pursuant to Mass. Gen. Laws 19C sections 3, 5, 9, and 11." Quinn allegedly denied his request stating:

> From the numerous reviews of the cases in which you were involved in some capacity, it has been determined, and affirmed in your appeal to the Department of Mental Retardation, that the provisions of each of these sections of the statute were complied with. The DPPC Executive Director reviewed the issues again upon receipt of your previous request for a Commissioner's Investigation, and concluded that these issues had been properly dealt with through the appeals process. No new information is presented in your correspondence to alter that view. Therefore, the Executive Director declines to further review this matter and has again determined that this matter is not appropriate for a Commissioner's Review. The Disabled Persons Protection believes that these cases have been thoroughly, fairly, and fully investigated and reviewed for appeal and reconsideration.

Id. at 83.

Glover continued to bring his concerns to the attention of political figures and other officials, including the Office of Civil Rights at the United States Federal Department of Health

and Human Services, id. at 88-89, and other federal agencies and officials. Id. at 90-102. Meanwhile, Glover continued to lobby state officials, particularly the Commonwealth defendants. In response to additional inquiries from Glover, Morin allegedly wrote Glover a letter on or about May 23, 2003, stating:

> The Department of Mental Retardation devoted significant resources to your appeal. It is the Department's position that your appeal was thoroughly and fairly considered. All inquiries brought on your behalf by the offices of former Governor Swift, the Governor's Commission on Mental Retardation and Senator Kennedy have been responded to in an open and cooperative manner. Upon review of the materials provided them each of the aforementioned offices have indicated their satisfaction with the Department's actions.

Id. at 115.

## ARGUMENT

### I.  GLOVER FAILED TO ALLEGE A CLAIM UNDER THE FIRST AMENDMENT

Glover's claim is based upon his First Amendment right to petition. In particular, he claims that the defendants "mishandled [the] investigations, and on a repeated basis, engaged in a pattern of activity, interfering with Mr. Glover's rights of petitioning various governmental offices to redress these grievances." Amended Complaint, § I, ¶ 5. Thus, he has filed this constitutional claim to "redress these mishandled investigations/appeal report . . ." Id. Glover limits his amended complaint to the acts or omissions of the named defendants "initiated on April 27, 2000," which Glover learned about on October 6, 2000. Id. at § IV. Causes of Action. Glover's claim is fatally flawed for several reasons.

To state a claim under 42 U.S.C. §1983, a plaintiff must allege that he 1) was deprived of a federally protected constitutional right and 2) the "person" who deprived him of that right was acting under color of state law. See Gomez v. Toledo, 446 U.S. 635, 639 (1980). Further, a

complaint based upon a violation of a civil rights statute must do more than state conclusions; it must at least outline the facts constituting the alleged violations. Glaros v. Perse, 628 F.2d 679, 684 (1st. Cir. 1980); Pavilonis v. King, 626 F.2d 1075, 1078 (1st. Cir. 1979); Leonardo v. Moran, 611 F.2d 397, 398 (1st. Cir.1979). The Complaint is insufficient when it is based upon "bald assertions, [and] unsupportable conclusions ...." The Dartmouth Review v. Dartmouth College, 889 F.2d 13, 16 (1st Cir. 1989) (quoting Chonquis v. Board of Appeals, 811 F.2d 36, 37 (1st Cir. 1986), cert. denied, 483 U.S. 1021 (1987)); accord Abbott, III v. United States, 144 F.3d 1, 2 (1st Cir. 1996).

A complaint must set forth "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable theory." Romero-Barcelo v. Heranandez-Agosto, 75 F.3d 23, 28 n. 2 (1st Cir. 1996). "It is axiomatic that the liability of persons sued in their individual capacities under § 1983 must be gauged in terms of their own actions." Rogan v. Menino, 175 F.3d 75, 77 (1st Cir.1999). The theory of respondeat superior cannot serve as a basis for § 1983 liability. See Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 48 (1st Cir. 1999).

The First Circuit has repeatedly held in civil rights cases that complaints grounded on mere conclusive statements, unsupported by specific facts as to who did what to whom and why, will not survive a motion to dismiss. See e.g. Coyne v. City of Somerville, 972 F.2d 440, 444 (1st Cir. 1992); Gilbert v. City of Cambridge, 932 F.2d 51, 62 (1st Cir. 1991); Correa Martinez v. Arrillaga Belendez, 903 F.2d 49, 53 (1st Cir. 1990); Dartmouth Review, 889 F.2d at 16; Dewey v. University of New Hampshire, 694 F.2d 1, 3 (1st Cir. 1982); Pavilonis, 626 F.2d at 1078; Leonardo, 611 F.2d at 398.

Glover's claim is fatally flawed for several reasons. First, nowhere in the amended complaint has he alleged how each of the individual defendants interfered with his right to petition. Glover merely makes the bald conclusion that all the defendants denied him his right to petition. As discussed above, this is insufficient. The amended complaint should thus be dismissed for this reason alone.

Second, not only has Glover failed to meet this fundamental pleading threshold, his amended complaint belies his conclusory allegation that the defendants somehow interfered with his right to petition. Indeed, the allegations indicate the defendants were cooperative and responsive. This does not support a claim for interference of the right to petition.

The Constitution guarantees "the right of the people peaceably . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. Through the Fourteenth Amendment, this provision applies to the states. Meyer v. Grant, 486 U.S. 414, 420 (1988).

An individual's right to petition does not include a constitutional right to plead his case on terms of his choosing. The Supreme Court has held "[t]he Constitution does not grant to members of the public generally a right to be heard by public bodies making decisions of policy." Minnesota State Bd. for Community Colleges v. Knight, 465 U.S. 271, 283 (1984). "Nothing in the First Amendment or in th[e] Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues." Id. at 285. A United States District Court in Massachusetts recently echoed these lessons, stating:

> The 'right to petition government afforded by the First Amendment does not include the absolute right to speak in person to officials. Where written communications are considered by government officials, denial of a hearing does

10

not infringe upon the right to petition. The right to petition government does not create in the government a corresponding duty to act.'

Cronin v. Town of Amesbury, 895 F. Supp. 375, 389-90 (D. Mass. 1995)(quoting Stengel v. Columbus, 737 F. Supp. 1457, 1459 (S.D. Ohio 1988)); see also Wagner v. City of Holyoke 241 F. Supp.2d 78, (D. Mass. 2003)(Ponsor, J.)("The right to petition the government for grievances is not unlimited.").

Glover's amended complaint clearly does not support a claim for the denial of his right to petition, even when all allegations are accepted as true and viewed in the light most favorably to Glover. The complaint contains 43 pages and 126 paragraphs outlining the myriad ways in which Glover petitioned many government officials and entities, including but not limited to the individual defendants, DMR, DPPC, and several state and federal government officials and politicians, without any interferences from the individual defendants. Far from interfering with his right to petition, Glover's own allegations demonstrate that when appropriate, the individual defendants responded to and followed up on Glover's inquiries. The allegations also demonstrate that Glover pursued applicable statutory and regulatory remedies with DPPC and DMR. Not only did he pursue these without interference from the individual defendants, in many instances it was one or more of the individual defendants who were facilitating or following-up on Glover's pursuance of his statutory and regulatory remedies. This conduct does not support a claim for denial of the right to petition. See Evicci v. Baker, 190 F. Supp.2d 233, 241 (D. Mass. 2002)(plaintiff must show some meaningful restriction on petitioning activities).

Rather than being based on the defendants' alleged interference with his rights to petition, Glover's claim appears to be based on his disagreement with the conclusions reached in the

investigation initiated by his complaint and in response to his numerous inquiries. Indeed, his amended complaint is replete with statements supporting this. See e.g. Amended Complaint, ¶ 77. Glover concludes his lengthy complaint by stating: "[B]ecause of these circumstances, and other mishandled investigations conducted by the DMR in the last ten years, I firmly believe [DMR's] Division of Investigations is rifled with numerous flaws requiring further inquiry. It is my hope necessary improvements may be instituted in the investigative practices being carried out by the DMR." Amended Complaint, § III, ¶ 1. It is obvious, however, that the mere disagreement with government decisions and policies cannot support a constitutional claim for the denial of the right to petition.

Glover cannot overcome these fatal defects merely by making the bald conclusion that the individual defendants retaliated against him because he purportedly notified them that he was considering litigation. In alleged civil rights cases, like this one, where an "improper motive" is an essential element of the claim, the plaintiff must allege *"specific, nonconclusory factual allegations giving rise to a reasonable inference"* of the improper motive. Judge v. City of Lowell, 160 F.3d 67, 75 (1st Cir. 1998) (emphasis in original). Bare conclusory allegations regarding intent are insufficient. The rationale for this is clear and applicable here:

> [C]laims against individual public officials have the potential to subject them to burdensome discovery and trials . . . that district judges may dispose of . . . prior to permitting any discovery where a plaintiff, having been provided the opportunity to do so, fails to allege 'specific, nonconclusory *factual* allegations that establish improper motive.' (emphasis in original)

It follows that the bases for dismissal in Judge and Dartmouth Review, 889 F.2d at 16 are equally applicable here. In those cases the dismissal was affirmed when the plaintiffs merely alleged causation or improper motive by "juxtaposing" the protected class or conduct with the allegedly wrongful conduct, "which, on its face, may as likely stem from negligence and incompetence as from racial animus." Id. at 78.

Here, plaintiff has done nothing more than juxtapose his alleged threat to bring litigation with decisions by some of the defendants with which he disagrees. See e.g. Amended Complaint, ¶¶ 44-49. There are no specific factual allegations of retaliatory acts. Likewise, there are no specific factual allegations of improper motive, or even allegations from which one could infer an improper motive.

For all the above reasons, Glover's amended complaint should be dismissed.

## II.  GLOVER'S CLAIM IS ALSO BARRED BY THE DOCTRINE OF QUALIFIED IMMUNITY

Qualified immunity applies to both the federal and the state claims. Rodriguez v. Furtado, 410 Mass. 878 (1991); Duarte v. Healy, 405 Mass. 43 (1989). It provides immunity from suit, not just liability. Mitchell v. Forsyth, 477 U.S. 511 (1988). "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Qualified immunity protects government officials performing discretionary functions in order to preserve their independence of action without deterrence or intimidation by the fear of personal liability and vexatious lawsuits. Lynch v. City of Boston, 989 F. Supp. 275, 286 (1997).

Qualified immunity is broad in that it "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Id. (quoting Malley v. Briggs, 475 U.S. 335, 341, (1986)). Thus, it must be certain that the official's conduct violated the law. If officials "of reasonable competence could disagree on th[e] issue, immunity should be recognized." Id. "Courts cannot expect government officials to predict the law, especially not on issues so complex and divisive that the Supreme Court must be called upon to rule." Lynch, 989 F. Supp. at 289; Ryder v. United States, 515 U.S. 177, (1995)("Qualified immunity specifically protects public officials from the specter of damages liability for judgment calls made in a legally uncertain environment.").

"Under § 1983, a government employee is immune to damages where a reasonable official could believe (the test is objective), albeit mistakenly, that his conduct did not violate" a clearly established constitutional right. Dirrane v. Brookline Police Department, 315 F.3d 65, 69 (1st Cir. 2002). Indeed, "qualified immunity leaves ample room for mistakes in judgment by the official and protects all but the most incompetent official or those who knowingly violate the law." Id.; see also Anderson, 483 U.S. at 639.

In light of the above, public officials are entitled to qualified immunity unless (1) the contours of the federal statutory or constitutional rights allegedly violated were clearly established at the time of the alleged violation and (2) the official's actions with regard to applying or following such clearly established law were not objectively reasonable under all the surrounding circumstances. Thus, if an official's conduct is objectively reasonable, he is entitled to qualified immunity even if the conduct infringed upon clearly established constitutional rights. Vargas-Badillo v. Diaz-Torres, 114 F.3d 3, 4 (1st Cir. 1997).

14

Lastly, it is well settled that the "defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense." Crawford-El v. Britton, 523 U.S. 574, 588, (1998). Thus, a bare allegation that the official acted with malice will not overcome the qualified immunity defense. Id. Although an official's malicious intent, such as acting in retaliation for some action taken by a plaintiff, may be an essential element of an affirmative claim, it has absolutely nothing to do with the separate legal doctrine of qualified immunity. Id.

Glover has not alleged any facts which would overcome the defense of qualified immunity. Assuming his allegations to be true, they amount to nothing more than questioning the manner in which the Commonwealth defendants exercised their discretion while performing their official functions. He does not claim that they did not comply with mandatory statutory or regulatory obligations. Rather, he merely disagrees with the way in which they exercised their discretion. There are no allegations that indicate anything other than the objective reasonableness of the Commonwealth defendants' discretionary conduct. Thus, for this additional reason, the Court should dismiss or enter summary judgment on all claims against the Commonwealth defendants.

### III. THE ELEVENTH AMENDMENT BARS THE OFFICIAL CAPACITY CLAIMS

Glover purportedly brings claims against the Commonwealth defendants both in their individual and official capacities. The official capacity claims are clearly barred by the Eleventh Amendment.

Indeed, 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

It is well settled that states and state officers, if sued in their official capacities for retrospective relief, are immunized by the Eleventh Amendment from suits brought by private citizens in federal court and, in any event, are not "persons" subject to suit under § 1983. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 70-71 & n.10 (1989); see also Kentucky v. Graham, 473 U.S. 159, 166-67 (1985); Hafer v. Melo, 502 U.S. 21, 30 (1991); Edelman v. Jordan, 415 U.S. 651, 664-68 (1974); O'Neill v. Baker, 210 F. 3d 41, 47 (1st Cir. 2000); Wang v. New Hampshire Board of Registration in Medicine, 55 F.3d 698, 700 (1st Cir. 1995).

For this additional reason, Glover's claim should be dismissed to the extent that it is brought against the Commonwealth defendants in their official capacities.

## CONCLUSION

For all of the above reasons, the Court should dismiss the claim against the Commonwealth defendants.

>GERALD MORRISSEY,
>PETER MORIN,
>BERNARD MURPHY,
>PAM NICHOLSON,
>LARRY TUMMINO
>
>By their attorney,
>
>THOMAS F. REILLY
>ATTORNEY GENERAL
>
>By: _____
>Timothy M. Jones
>Assistant Attorney General
>Western Massachusetts Division
>1350 Main Street, 4th Floor
>Springfield, MA 01103
>(413)784-1240 ext. 105
>(413)784-1244 - Fax
>BBO#618656

## CERTIFICATE OF SERVICE

I, Timothy M. Jones, hereby certify that on December 18, 2003, I served a copy of the foregoing **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR, ALTERNATIVELY, SUMMARY JUDGMENT** by First-Class Mail, postage prepaid, on the following parties of record:

JT Glover, III
46 Quincy Street, #5
North Adams, MA 01247

_____
Timothy M. Jones

17