United States District Court
District of Massachusetts
Western Division

CIVIL ACTION NO. 03-CV-11633-MAP

JT Glover, III, pro se            )
                                  )
            Plaintiff,            )
                                  )
v.                                )
                                  )
Representatives from the          )
Massachusetts Department of       )
Mental Retardation –Central       )
Offices-Boston:                   )
Mr. Gerald Morrissey              )
Mr. Peter Morin                   )
Mr. Bernard Murphy                )
Ms. Pamela Nicholson              )
Mr. Larry Tummino                 )
                                  )
            Defendants.           )

## PLAINTIFF'S MOTION OPPOSING DEFENDANTS MOTION TO DISMISS OR FOR SUMMARY JUDGEMENT. ALTERNATELY, MR. GLOVER SUBMITS A MOTION FOR AN ALLOWANCE OF 60 DAYS TO RESUBMIT A SECOND AMENDED COMPLAINT CONSISTING OF ADDITIONAL SPECIFIC, NON CONCLUSORY ALLEGATIONS ON HOW THE DEFENDANTS INDIVIDUALLY PARTICIPATED IN THESE AFOREMENTIONED CONSTITUTIONAL DEPRIVATIONS.

Mr. JT Glover III, on behalf of himself, submits this motion and memorandum of points and authorities opposing the defendant's motion to dismiss, or alternately seeking summary judgment pursuant to Fed. R. Civ. P. 12(b) (1), 12(b) (6) and 56, for each of the named defendants of the Massachusetts Department of Mental Retardation (DMR).

Alternatively, since the plaintiff is representing himself in these matters, and the defendants are being represented by the Office of Massachusetts Attorney General, he is also seeking 60 days to resubmit a second amended complaint providing additional factual underpinnings pursuant to Fed. R. Civ. P. 12 (e) on how the aforementioned defendants individually denied and or interfered with the plaintiff's right to petition these mishandled investigations and appeal report with the DMR and other offices as well; and previously retaliated against the plaintiff's freedom of speech and expression activities. Additionally, in this second amended complaint, the plaintiff will outline specific procedure errors pursuant to DMR Regulations, 115 CMR 9.0, some of which were already brought to the attention of specific individual defendants (amended complaint, factual allegations, p. 56, 58, 60).

Given the factual allegations cited in the plaintiff's amended complaint and this memorandum of points and authorities calls for a discovery phase allowing the plaintiff to submit to this court factual documentation already in his possession expanding on how he was 'deprived of rights by the defendants whom were acting under the color of state law'. Allowing discovery is also necessary to obtain additional supporting evidence indicating that the defendants did indeed knowingly engage in these aforementioned assertions being made by plaintiff-all of which will demonstrate 'sufficient factual support to warrant their consideration at trial' and their conduct was one of improper motive.

On December 26, 2003, the plaintiff left a voice mail message with Assistant Attorney General Timothy Jones requesting his assented to motion to submit a second amended complaint.

Wherefore, after reviewing this submitted opposing motion and the supporting memorandum of Points and Authorities, the plaintiff moves this court to deny the defendants motion to dismiss, or alternately summary judgment; and permit 60 days for the plaintiff to resubmit a second amended complaint.

The Plaintiff,
On behalf of himself:

By _____

JT Glover III, Pro-Se
46 Quincy Street #5
North Adams, MA 01247
413-664-9093

## CERTIFICATE OF SERVICE

I, JT Glover, herby certify that on December 29, 2003, I served a copy of the foregoing **oppositional motion to the defendants' motion to dismiss, or alternately, summary judgment** by First-Class, Certified Mail, postage prepaid, on the following parties of record:

Assistant Attorney General Timothy Jones
Western Massachusetts Division
1350 Main Street
Springfield, MA 01103

United States District Court
District Of Massachusetts
Western Division

Civil Action No. 03 CV 11633 MAP

|  |  |
|---|---|
| JT Glover III, pro-se<br>    Plaintiff | ) |
|  | ) |
| Vs. | ) |
|  | ) |
| Representatives affiliated<br>with the Massachusetts<br>Department of Mental<br>Retardation-Boston | ) |
|  | ) |
| Mr. Gerald Morrissey<br>Mr. Peter Morin<br>Mr. Bernard Murphy<br>Ms. Pamela Nicholson<br>Mr. Larry Tummino<br>    Defendants | ) |

## Plaintiff's Memorandum Of Points And Authorities In Support Of This Oppositional Motion To The Defendants' Motion To Dismiss, Or Alternately, For Summary Judgment

Mr. JT Glover III, on behalf of himself, pursuant to Fed R. Civ. P. 56, submits this memorandum of Points and Authorities in support of the Plaintiff's opposing motion to the defendants' motion to dismiss, or alternately, for summary judgment. Additionally, pursuant to Fed. R. Civ. P. 12(e), the plaintiff seeks 60 days to resubmit a second amended complaint expanding on these aforementioned claims on how his constitutional rights were violated by the defendants employed by the Massachusetts Department of Mental Retardation (DMR).

**Introduction**

1.    On September 2 and 3, 2003, Mr. Glover filed complaints in the US District Court of

Boston and Springfield pursuant to 42 USC Section 1983 against individuals employed

by the DMR stemming his effort to redress the mishandling of specific investigations and

an appeal report pursuant to DMR Regulations, 115 CMR 9.00. This civil action also

seeks to rectify the acts and or omissions taken by the defendants towards the plaintiff

attempting to correct the false conclusions and numerous discrepancies occurring

throughout these investigations and appeal report as well. The plaintiff seeks damages in

the amount of $200,000 for each of the individually named defendants and any other

relief the court deems appropriate. Amended complaint, cover page.

2.    The aforementioned defendants, whom contributed to the mishandling of these

investigations and appeal report, or possessed knowledge about these alleged

improprieties, knowingly interfered with the constitutional rights asserted by the plaintiff

allowing him to petition a redress of these accumulating grievances with various

governmental offices, which included the DMR itself. Furthermore, after the plaintiff

notified the DMR that he wished to eventually redress these matters in a court of law,

specific defendants retaliated against the plaintiff's Freedom of Speech and expression

activities by altering factual information utilized for these investigations and appeal

report (amended complaint, factual allegations, p. 45-54; enclosure).

3.    Additionally, the plaintiff amended these complaints with the US District Court of

Boston and Springfield on October 15 and 16, 2003 since he wanted to ensure these

individuals were not only being sued in their 'official capacities;' but more importantly,

in their 'individual capacities' as well. Each of the named defendant's own conduct

should be individually scrutinized relating to these matters beginning on November 14,

1999 and ending on or about May 23, 2003.

1

4.    Furthermore, evidence previously presented to individual defendants on specific occasions clearly indicated these specific investigations and the appeal report were mishandled (amended complaint, factual allegations, p. 33, 35, 38, 42, 45, 55, 56, 60, 111). Ignoring these assertions made by the plaintiff and subsequently providing false or conflicting information to the plaintiff and various governmental offices about these matters indicate a deliberate indifference by the defendants because of their failure to correct these matters in an appropriate fashion.

5.    On December 19, 2003, the plaintiff received the answer (to his two amended complaints) filed by the Office of the Attorney General of Massachusetts, whom is representing the defendants in these legal matters, which seeks a motion to dismiss, or alternately, summary judgment. Due to the factual allegations cited in the plaintiff's amended complaint-and other voluminous documentation in his possession-indicates a preponderance of evidence which will eventually weigh towards the plaintiff claims. Because of these circumstances, the defendant's motion should not be granted.

6.    In an effort to overcome the defendant's motion to dismiss, and alternately, summary judgment, the plaintiff will utilize excerpts from the Investigations Advisory Panel Report for the Massachusetts Department concluded in April 1998; the DMR Decision Letter and Action Plan completed on April 27, 2000 and May 11, 2000, conducted by defendants Comerford, Huntington and Williams; and the appeal report conducted by defendant Nicholson; which was submitted to defendant Morrissey on or about January 25, 2001.

7.    In addition, the plaintiff will list verbatim House bill 2066 referred to the committee
on Human Services and Elderly Affairs on January 1, 2003; as well as incorporating
relevant case law supporting his opposing motion. An addendum will also be included
citing articles ran in The Boston Globe indicating other long term problems that have
plagued the Division of Investigations of the DMR having familiarity with some the
plaintiff's assertions.

8.    The plaintiff's amended complaint 'does clearly outline the (initial) facts constituting
the alleged violations' and disagrees with the defendant's implication that his claim 'is
insufficient when it is based upon "bald assertions, [and] unsupportable conclusions." In
this opposing motion, and alternately, in a second amended complaint, the plaintiff
wishes to expand on how the defendants individually contributed to the denial of his right
to redress evidence indicating procedure irregularities pursuant to DMR Regulations 115
CMR 9.00; and or specific defendants retaliated against the plaintiff's freedom of speech
and expression activities by altering factual information in various official DMR
documentation.

9.    'Although pro se litigant is entitled to have his or her own pleadings liberally
construed...' (Fisher v. United Feature Syndicate, 37 F. Supp. 2d 1213 D.C. Colo. 1999)
that 'set forth the facts constituting the alleged violations'; given his pro se status, the
plaintiff is requesting 60 days to resubmit a second amended complaint providing
additional factual underpinnings supporting these aforementioned claims.

10.    When considering whether or not to grant a motion to dismiss, or alternately summary

judgment for the defendants named in this civil action, the plaintiff asks the US District

Court to bear in mind:

"Pursuant to this rule (of Fed R. Civ. P. 56), a court is compelled to look beyond the bare
allegations of pleadings to determine if they have sufficient factual support to warrant their
consideration at trial." Liberty Lobby, Inc v. Dow Jones & Co., 838 F. 2nd 1287 (DC Cir.
1988), cert. denied, 488 U.S. 825, 109 S.Ct, 75, 102 L.Ed.$2^{nd}$51 (1988); Aries Reality, Inc v.
AGS Columbia Associates, 751 F. Supp. 444 (S.D.N.Y. 1990).

"In determining whether an official is entitled to qualified immunity, we (1) identify the
specific right allegedly violated; (2) determine whether the right was" clearly established;"
and (3) determine whether a reasonable officer could have believed that his or her conduct
was lawful" Alexander v. City and County of San Francisco, 29 F.3d 1355, 1363-64 (9th Cir.
1994).

"A plaintiff bringing a Section 1983 action should include in his complaint all the factual
allegations necessary to sustain a conclusion that the defendant violated clearly established
law, and if the plaintiff fails to make such allegations, the court must afford the plaintiff an
opportunity to come forward with such additional facts or allegations" Achterhof v.
Selvaggio, 886 F.2d 826(6th Cir. 1989).

"Qualified immunity is usually raised by a motion for summary judgment after a limited
amount of discovery has been conducted to determine whether defendants acted objectively
and in a reasonable manner. The court takes a broad view of what constitutes 'clearly
established' and the balance favors the plaintiffs when dealing with a motion to dismiss"
Whisman v. Rinehart, 119 F3d 1303 (8th Cir. 1997).

"Limited discovery may sometimes be necessary before the district court can resolve a
motion for summary judgment on qualified immune immunity" Crawford-El v. Britton, 118
S.Ct. 1584 (1998)

"Discovery must be allowed prior to a Rule 56 motion in cases where plaintiffs do not have
access to investigative files or other crucial information which is in the exclusive control of
the defendants. Lack of access to such files prevented the plaintiffs from alleging their claim
with more specificity, and dismissal prior to discovery would be inequitable" Riggs v. City of
Albuquerque, 916 F.2d 582 (10th Cir. 1990).

"Cases involving constitutional or civil rights 'frequently are unsuitable for summary
judgment' because a necessary element of a claim presents an inquiry into the state of mind
of the defendants" Seamons v. Snow, 206 F.3d 1021 (10th Cir. 2000).

4

**Excerpts from The Investigations Advisory Report for the Department of Mental Retardation: April 1998:**

Introduction:

"In June 1997, Gerald Morrissey, Commissioner of the Massachusetts Department of Mental Retardation (DMR), appointed an Investigations Advisory Panel to determine how DMR "can improve its investigative capacity and systems for protecting the safety and well being of the people (they) serve." Toward that end, the panel was charged with examining DMR's intradepartmental and interagency relationships and specific problem areas of the DMR Investigations Unit, including: the hiring practices, training and supervision of investigative staff, the scope of investigations, the timeliness and quality of investigations and reports, internal and external communication procedures, and the provision and monitoring of protective services."

The panel was formed in response to the findings of the report, *Are You Sure About This* Guy, issued by the House of Representatives Post Audit and Oversight Bureau in June 1997. The report focused on several highly publicized cases involving the abuse of persons with mental retardation in Massachusetts, and on issues these cases highlighted in the management, operation, and outcomes of the DMR Investigations Unit.

*B. Management problems*

In studying the training and competency requirements for DMR investigators, the panel was alarmed to discover that there are no minimum requirements or mandates for continued in-service training. Further, the current position summary job description for a staff investigator is inappropriate given their duties and training. There are no consistent management systems in place to ensure that specific investigators are qualified to investigate the cases assigned to them.

Moreover, there is no specialized training program for the Unit and no requirements for on-going training. Investigators are not notified nor are many aware of the no-cost training opportunities available, and when training opportunities do arise for investigators, they are sometimes discouraged from attending because of their voluminous caseloads. Supervision also varies widely across the state, ranging from regular monitoring of cases by the senior investigator in one area to inconsistent review and discussion of cases in another. In short, investigators are expected to perform functions for which they may lack the necessary training and legal authority, and for which they may receive insufficient supervision.

Moreover, although the action plans for a particular investigation are sent to the senior investigator, they are not shared routinely with the initial investigator. In theory, the goal of this policy is to maintain complete independence between investigators and operations, but its practical effect is to perpetuate a balkanized system that is full of confusion, friction, and disenchantment among those involved. Furthermore, the segregation of investigators has unwittingly encouraged an unhealthy secrecy about their work. The fact that the outcomes of investigations have not been integrated or coordinated systematically with the licensing and contracting procedures of DMR was particularly disturbing to the panel.

5

Finally, we discovered that the Investigations Unit is vulnerable to pressures-subtle or otherwise-that could compromise the integrity of investigation findings. Related to this concern, there were instances cited in which information contained in reports was altered.

*The Crisis in Public Confidence:*

It is obvious that complaints of abuse and neglect against employees of an agency can be a potential source of embarrassment or prompt defensiveness by any agency. Such complaints may call into question the agency's policies, procedures, and priorities. Indeed, many of those who spoke at the public hearings and those who submitted written statements to the panel took the position that the Department simply could not investigate itself, and that an independent agency for investigations was needed. The panel considered these charges carefully and concluded differently."

First, there already *is* an independent state agency charged with investigating allegations of abuse and neglect of persons with mental retardation and for monitoring DMR's investigative activities. Ironically, however, DPPC is largely ignored by the public as an existing remedy.

Second, some of the complaints that "DMR cannot investigate itself" come from individuals who were disappointed or disagreed with the findings of an investigation or the action or inaction following an investigation. For individuals who disagree with the findings of an investigation, a formal appeals process is available. For those who are disappointed with the action or inaction following an investigation, it is often more appropriate to direct their concerns to the operations units rather than to the Investigations Unit. Indeed, we heard of numerous instances in which the "action plans" were inexplicably delayed, inadequate to the problem, or poorly implemented.

*Training Requirements for DMR investigators*

In conducting a review of the training and skill requirements for DMR investigators, the panel was dismayed to discover that there are no minimum requirements or mandates for continued in-service training. Through interviews with investigators and a review of the materials given to them, it is clear that there has been no specific statewide training offered by DMR. However, despite the lack of formal training offered to investigators by DMR, the panel was impressed with the level of commitment demonstrated by investigators who had little or no agency-based resources or support but who sought out training opportunities and conferences (sometimes on their own time and at their own expense) in order to increase their skills.

The lack of basic and ongoing training by DMR is unacceptable for an agency dedicated to the protection of such a vulnerable population with highly specialized needs. Consistent, specific training for DMR investigators is essential to the maintenance of a high standard of services and investigations to and for its clients. *Therefore, we recommend that every investigator and supervisor complete a 40 hour Basic investigation training course.* This training would be required to be completed within three months from the first day of employment and prior to undertaking investigations independently. The panel has developed a training model for investigators that should become standardized."

6

11.    Furthermore, these matters indicate an inadequacy of training and/or supervision

provided to the DMR's Division of Investigations on past occasions-all of which may have

contributed to the mistaken conclusions and numerous discrepancies occurring throughout

these specific investigations and appeal report.  When considering whether or not to grant a

motion to dismiss, or alternately summary judgment for the defendants in this civil action,

the plaintiff asks the US District Court to bear in mind:

In City of Canton v. Harris, 489 U.S. 378,388-389, 109 Ct. 1197, 1204-1205, 103 L.Ed.2d
509 (1989), it is cited "Similarly, the U.S. Supreme Court has also held that the inadequacy
of [police] training may serve as the basis for 1983 liability where the failure to train amounts
to deliberate indifference to the rights of persons with whom [the police] come into contact.

Furthermore in City of Canton v. Harris 489 U.S. at 390, 109 S. Ct. at 1205 noted is "It may
be, however, that in light of the duties assigned to [specific officers] or employees the need
for more or different training so obvious, and the inadequacy so likely to result in the
violation of constitutional rights, that the policymakers [of the city] can reasonably be said to
have been deliberately indifferent to the need. In that event, the failure to provide proper
training may fairly be said to represent a policy for which [the city] is responsible and for
which [the city] may be held liable if it actually causes injury.


**Supportable conclusions indicating direct interference/retaliation from defendants
Comerford, Huntington, Nicholson and Williams towards the plaintiff's freedom of
speech and expression activities; and or his effort to redress these mishandled
investigations:**

12.    Pursuant to DMR Regulations 115 CMR 9.11, on November 15, 1999, the plaintiff

filed an appeal directly with defendant Morrissey to grieve the initial investigations seeking

adequate rectification. Furthermore, on November 22, 1999, defendant Williams assigned a

new investigation to be conducted by defendant Comerford. It was not until October 6, 2000,

when the plaintiff discovered this investigation was not completed until April 27, 2000 and

May 11, 2000, respectively (amended complaint, factual allegations, p 43, 48, 49, 50).

7

13.    Almost ten months after the plaintiff initially grieved these matters, on September 15, 2000; this appeal was assigned to be completed by defendant Nicholson. The plaintiff requested from her that she reinvestigate the mistaken conclusions and misleading information occurring in these investigations initiated on July 13, and 20, 1999. Furthermore, the plaintiff wished for defendant Nicholson to rectify the numerous discrepancies and mistaken conclusions included in the follow up investigation conducted by defendants, Comerford, Huntington and Williams. Misleading statements were inserted in this investigative report pertaining to conversations held between the plaintiff and another former BFAIR, Inc employee (some of which have been underlined below) whom previously corroborated aspects of the abuse and mistreatment occurring in the group home they worked in; as well as other factors involving this investigation.

14.    Defendants Comerford and Williams altered specific statements and factual circumstances in direct retaliation against the plaintiff's freedom of speech and expressions activities he previously engaged in with these defendants (regarding his desire to file pending legal action) before these individuals completed this follow up investigation.

15.    Furthermore, because of the manner in which the investigation was concluded by defendants Comerford, Huntington and Williams, it was 'unable to identify [this investigation] as a problem case and move swiftly to remove to remove clients from an abusive situation' (House Bill 2066, January 1, 2003). Because of these numerous discrepancies contained throughout this investigation, it failed to adhere to specific investigative procedures that should have been followed pursuant to DMR Regulations 115 CMR 9.00, which the plaintiff would like to identify in a second amended complaint.

8

16.    The plaintiff provided pertinent documentation (amended complaint, factual allegations, p 51-55) to Ms. Nicholson all of which indicated these investigations were conducted in a biased and unprofessional manner.  Defendant Nicholson ignored these assertions and the supporting evidence provided by the plaintiff by including additional false conclusive statements in this appeal report as well.  The manner in which both this follow up investigation and appeal were completed should be construed as defendants Comerford, Huntington, Nicholson and Williams possessing an improper motive by interfering with the rights asserted by the plaintiff attempting to correct the numerous mistaken conclusions occurring throughout these investigations.

17.    When considering whether or not to grant a motion to dismiss, or alternately summary judgment for defendants Comerford, Huntington, Nicholson, and Williams, the Plaintiff would like this court to bear in mind:

"Where the right retaliated against is clearly established, the unlawful intent inherent in a retaliatory act places it beyond the scope of qualified immunity" Block v. Ribar, 156 F.3d 673 (6TH Cir. 1998).

"The defendant is not entitled to summary judgment simply by making a prima facie showing of proper reasons for the challenged conduct, and the defendant is not entitled to summary judgment if the plaintiff can produce specific evidence, circumstantial or direct, of improper motivation" Walter v. Morton, 33 F.3d 1240 (10th Cir. 1994).

"At the summary judgment stage, the defendants cannot prevail if the plaintiff can present a version of the facts that is supported by the evidence and under which the defendants would not be entitled to qualified immunity" Marshall v. Allen, 984 F.2d 787 (7th Cir. 1993).

"The court should not decide for qualified immunity on summary judgment when there is a genuine dispute as to the 'facts and circumstances within an officer's knowledge' or what the officer did or failed to do.' In such cases, the judge must postpone that determination, and the case must go to trial" Sloman v. Tadlock, 21 F.3d 1462 (9th Cir. 1994).

"Speech that calls attention to government's failure to discharge its duties generally constitutes a matter of public concern" Lee v. Nicholl, 197 F3d 1291 (10th Cir. 1999).

**Excerpts from DMR Decision Letter and Action Plan, 01-2110-99-394-investigation conducted and summarized by defendants Comerford, Huntington, and Williams:**

TO: Rick Huntington, Area Director Berkshire Area Office
From: Steven Williams Investigator, Division of Investigations
Date: April 27, 2000

DECISION LETTER, 01-2110-99-394

I have received and reviewed the complaint assigned to Mr. Harry T. Comerford, Staff Investigator by myself as the Senior Investigator on November 22, 1999. The investigation was completed by Mr. Harry T. Comerford on April 27, 2000 and forwarded to me for review and comment. I have reviewed and accepted the report as written and felt that the investigation was conducted in a fair, impartial and professional manner.

SUMMARY OF ALLEGATIONS:

The reporter (defendant Williams) indicated WI (plaintiff), a former employee of the BFAIR agency, stated he (W 1) has additional documentation on computer disk(s) supporting prior unsubstantiated allegations of abuse and mistreatment towards DMR funded individuals. The reporter claimed WI would not provide the information to him via computer disk or printed materials.

METHODOLOGY:

Six (6) individuals were interviewed for the purpose of this investigation including the alleged victim. The documents reviewed were (1) DMR Complaint Form # 01-2110-99-394, (2) DMR Investigative Report # 01-2110-99-243, 01-2110-99-249 by Mr. Jeffrey Peyman, (3) DPPC 19C Intake Forms # 32045, 32099 and 32100, (4) Essay II, Residential Human Services, and other correspondence by W 1, (5) DMR e-mail correspondence by Mr. Steven Williams, Ms. Maureen Kirk and Ms. Terry O'Hare, (6) Follow up Report to Mr. Steven Williams by Mr. Jeffrey Peyman DMR Incident Reports concerning V 1 on file at the DMR Pittsfield area office.

Investigation Decision Letter, **01-2110-99-394**

**FINDINGS AND CONCLUSIONS:**

- The Staff Investigator concluded the allegations that Conlon physically and emotionally mistreated Client 1 and Client 2 are not substantiated.
- Based on the statements of Maselli, who indicated he did not witness Conlon mistreating Client 1 or Client 2 when he worked with Conlon.
- Based on the statements of Conlon, who denies mistreating Client 1or Client 2.
- Based on the fact that Glover did not provide any additional information concerning the allegations he made that Conlon was physically and emotionally mistreating V 1 and V 2.
- Based on the fact that the Incident Reports reviewed at the DMR area office did not show a particular pattern of injuries or incidents when Conlon worked with Client 1.

" Mr. Peyman contacted Maselli and interviewed him on 11/16/99, with Mr. Steven Williams. (Mr. Williams is the Senior Investigator at the DMR Region I area and Mr. Peyman's supervisor.) Maselli told Mr. Peyman and Mr. Williams that he worked from July to November 1996 and had trained Glover. Maselli indicated Glover calls him frequently and talks about what Conlon did to the individuals at Hall Street. Maselli claimed he does not always remember saying the things that he told him in the past. Maselli recalled that he never observed Conlon hit the individuals but he has observed Conlon escort Client (1) in a rough manner.

Mr. Peyman indicated while he and Mr. Williams were interviewing Maselli, Glover called him and requested that they meet him at his residence because he had something to give them. Mr. Peyman and Mr. Williams met with Glover. Mr. Peyman reported Glover presented a stack of computer disks and stated to Mr. Peyman and Mr. Williams that the disks contained information and dates pertaining to the allegations of abuse he had originally reported. Glover would not allow Mr. Peyman to have access to the disks or the information on the disks. Glover informed Mr. Peyman that all of the information was contained in the narrative letter he had included with the original allegations. Mr. Peyman told Glover the information he is alleging that is on the disks would be helpful to corroborate the information in the allegations. Glover refused to give Mr. Peyman and Mr. Williams the disks, a copy of the disks or printed copy of the information contained on the disks.

Mr. Steven Williams confirms Mr. Peyman's statements concerning their interview with Maselli and Glover on 11/16/99.

This investigator called Glover on 11/29/00. 11 indicated he did not want to talk to this investigator or anyone else from DMR. Glover claimed he had provided all of the information he had to Mr. Peyman concerning the allegations of abuse by Conlon towards client (1) and client (2). Glover reported he did not have the dates of the alleged incidents on the computer disks and he did not have any additional information to provide concerning the allegations.

Glover indicated Maselli provided false information to Mr. Peyman because he did not want to get involved. Glover again told this investigator that he did not want to be interviewed and stated that he is consulting with an attorney. Glover discontinued the conversation and requested not to be contacted.

"Maselli indicated he trained Glover when he started working at the Hall Street residence, Maselli stated, "Glover is a pain in the butt. He calls me all the time." Maselli claimed Glover calls him all the time and is constantly asking him if he remembers Conlon abusing the residents at Hall Street. Maselli explained he does not remember any incidents of abuse by Conlon towards the Hall Street residents and he does not remember telling Glover about any incidents of abuse. Maselli stated, "He (Glover) is always putting things in my head, i.e., come on, you know what he is doing, tell me you don't remember." Maselli indicated he thought Glover might be taping their telephone conversations stating, "He was asking me leading questions." Maselli stated Glover asked him, "You know Conlon abused the guys, you saw him." Maselli stated he told Glover, "I never saw Conlon do that."

"Maselli indicated Glover told him (Maselli) that he (Glover) needed him to back him up stating, "Glover wanted me to back him up. He said I said things on the telephone. He said I must have been drunk on the phone." Maselli reported Glover told him he had an attorney and stated, "Jump on the bandwagon now, Dude. I have a lawsuit." Maselli stated, "He was insinuating I could make money."

11

"Maselli explained that he might have been drunk when he talked to Glover because he was drinking heavily, but he has since quit drinking and has been sober for six months. Maselli added he may have said things to Glover when he was drunk but he does not remember what he said and stated, "I didn't see Conlon abuse the guys." Maselli indicated he would not consider himself a credible witness to Glover's allegations, based on the fact that he was drinking heavily when he worked at Hall Street. It has been four years since he worked there and that Glover has tried to convince him that he made statements that he does not remember making. Maselli stated, "Glover used to call me up and tell me stories about Conlon. Glover should have reported the abuse. He is the one who said he saw it."

"According to Conlon, he has worked at the Hall Street residence for approximately nine years. Conlon indicated Maselli used to call him when he was drunk and tell him that Glover was constantly calling him. Maselli told Conlon that Glover called him all the time and might be trying to get him on tape. Maselli told Conlon that he asked Glover if he was taping their conversations and Glover said, "Yes." Maselli told Conlon that Glover informed him (Maselli) that he (Glover) had a lawsuit against DMR and was going to make some money."

To: The Parties the Complaint
From: Rick Huntington, Berkshire Area Director
Date: May 11, 2000

Subject: Action Plan For Complaint 01-2110-99-394

On November 22, 1999, an abuse/mistreatment complaint under Chapter Nine of the Department was filed with the Department's Division of Investigations on behalf of two men receiving DMR funded residential services alleging that they had been physically and emotionally mistreated by an employee of the contracting provider agency. Specifically, the complaint alleged that a former employee of the contracting vendor agency indicated that he possessed documentation which would support previously filed complaints, which were determined to be unsubstantiated. The Senior Investigator appointed a Staff Investigator on that date.

On May 10, 2000, I received a copy of the Senior Investigator's Decision Letter (dated April 27, 2000) in which he determines that the allegations of mistreatment are **NOT** substantiated. This determination is based on the findings of the Investigator that there is no supporting evidence of the allegations and that a review of Incident Reports revealed to a pattern of injuries or incidents.

**No Actions are indicated.**
**Please take note of the appeals information.**

12

**Pages 28-30 noted from the specific Appeal conducted and summarized by defendant Nicholson**

"This case illustrates the need for complaints to be filed in a timely manner. By the time Mr. Glover formalized his allegations in a complaint in July 1999, memories had faded, dates had blurred, and injuries had healed. The extreme delay in reporting virtually foreclosed a meaningful investigation.

Mr. Glover's failure to make a timely report is mitigated by two significant factors. First, Mr. Glover did tell his supervisor about his concerns in December 1998. Unfortunately, she did nothing about it. This is particularly troubling in light of the incident reports regarding injuries of unknown origin that she reviewed and signed off on in the months following Mr. Glover's allegations. Her comments indicate that the individual's injuries could be traced to a time when the individual was in the care of Staffperson C and that Staffperson C had failed to properly document the circumstances of each injury. Secondly, although BFAIR has a "report everything" policy, reporters are not clear about their responsibilities under the law. Apparently, an employee can satisfy the BFAIR reporting requirements for injuries of unknown origin by making a note in a log book, filling out an Incident Report, telling a supervisor, or filing a DPPC complaint. (Telephone interview of BFAIR Human Resource Coordinator/Human Rights Trainer, October 26, 2000).

The mitigating factors are not, however, sufficient to overcome a mandated reporter's statutory duty to report. There is sufficient evidence to support the finding that Mr. Glover failed in his duty to report abuse and/or mistreatment. The investigator's conclusion should be affirmed.

**E. Whether the investigation was conducted in a thorough and impartial manner.**

In the extraordinary volume of paperwork submitted by Mr. Glover with his appeal, he has raised numerous points about what he characterizes as "discrepancies and mistaken conclusions" which he contends are evidence that the three investigations were not conducted in a thorough and impartial manner. To the extent that Mr. Glover disagrees with the investigators' findings, those issues have already been discussed at length in the foregoing analysis and will not be reconsidered under this heading. With regard to manner in which these investigations were conducted, they were not perfect. It is reasonable to expect that the DMR regulations and good investigative practice will be followed. There were, in retrospect, some procedural errors. The following procedure errors bear discussion:

Investigator Peyman failed to interview Staffperson C in connection with the allegation that had been made against him in Complaints C-l, C-2 and C-3. This omission was remedied when Staffperson C was eventually interviewed by Investigator Comerford on April 11, 2000. At that time, Staffperson C denied that he had ever mistreated the individuals in the home. Although he should have been interviewed in the first investigation, he was ultimately interviewed.

Complaint C-4 was triggered by the follow-up interview that Investigator Peyman and Senior Investigator Williams had with Mr. Glover on November 16, 1999. During the course of that interview, Mr. Glover evidently indicated that he was not interested in filing another complaint. Because the complaint was based on statements made by Mr. Glover, Senior Investigator Williams listed Mr. Glover as the reporter but Mr. Williams actually considered himself to be the reporter. When the Investigation Report was issued in April 2000, Senior Investigator Williams did not provide Mr. Glover with a copy of the decision.

When this appeals officer learned that Mr. Glover had never received the concluding documentation of the Comerford investigation, the oversight was promptly remedied. Because Mr. Williams' office had previously sent documentation to Mr. Glover indicating that Mr. Glover was the reporter, Mr. Glover should have received a copy of the decision.

Finally, a careful review of the manner in which these investigations were conducted yielded no evidence that any of the investigators' conclusions were the product of, or influenced by, bias of the investigators. This investigation was hindered by excessive delay and inconsistent memories. There is no indication of bias.

**Conclusion and recommendations.**

Based upon the foregoing discussion, I am making the following recommendations:

1. The investigator's conclusion that mistreatment was substantiated against Mr. Glover should be affirmed. Mr. Glover's conduct was inappropriate, unprofessional, and unacceptable and can be fairly characterized as mistreatment.

2. The investigator's conclusion that mistreatment could not substantiated against Staffperson C should be affirmed. The weight of the evidence does not support a conclusion that Staffperson C abused or mistreated the individual's in his care (note amended complaint, enclosure).

3. The investigator's finding Mr. Glover may have provided false information in retaliation for the complaint that was filed against him should be rejected. There is no evidence to support this finding.

4. The investigator's conclusion that Mr. Glover failed in his duty to report abuse and/or mistreatment should be affirmed. There is sufficient evidence to support this finding.

I recommend that the Investigation Report, Decision Letter, and Action Plan be modified by making this appeal decision and the analysis contained herein an Addendum to the Investigation Report.

Finally, I recommend that the following actions be incorporated into an Amended Action Plan to be issued by the Regional Director (defendant O'Hare) or her designee to insure that the identified errors are not repeated:

2. The director of the DMR Berkshire Area Office will review procedures for transfer of cases between service coordinators to insure that all relevant information is conveyed to a new service coordinator, with particular attention to the issue of conveying information regarding injuries of unknown origin; and,

3. The director of the DMR Investigations Division (defendant Murphy) will address the procedural errors identified in Section III.E as an aspect of training or otherwise as he deems appropriate."

14

18.    After reviewing paragraphs 12-17 of this memorandum and specific excepts taken from this specific follow up investigation and appeal report, the plaintiff asks that this court now familiarize itself with the cover letter and report compiled by Mr. Kevin Hall, New England Director of the Citizens Commission on Human Rights submitted to General Counsel Ralph Calderaro of the Disabled Persons Protection Commission on February 25, 2003 (amended complaint, enclosure).

**These mishandled investigations and appeal report were brought to the attention of the Legislature's House Post Audit and Oversight Bureau: May-October 2001**

19.    Initially in May 2001, the plaintiff provided information to the State Legislature's House Post Audit and Oversight Committee indicating the DMR's mishandling of these specific investigations and appeal report. On August 22, 2001, the plaintiff met with Ms. Allison Robles, a representative from this office, at the State House in Boston. During this meeting, the plaintiff was relieved to learn that Ms. Robles understood the legitimacy of these expressed concerns and would be referring these matters to the House Post Audit and Oversight Bureau's Director, Mr. James Tansey for possible handling.

20.    Additionally, the plaintiff held subsequent phone conversations with Director Tansey and also provided him with pertinent documentation on September 5, 2001, September 19, 2001 and October 11, 2001 indicating questionable practices being carried out by individual DMR employees most of whom were subsequently named as defendants in these civil proceedings. Some of the information contained in this documentation has important factual relevance in aspects of the plaintiff's claims.

21.    Furthermore, at the same time, the plaintiff also initiated efforts with the Joint Committee on Human Services and Elderly Affairs; as well as other offices, advocating for specific legislation on aspects of the long-term problems facing the DMR's Division of Investigations.

15

**On November 1, 2003, the plaintiff discovers the existence of House Bill 2066 submitted to the Committee on Human Services on January 1, 2003:**

By Mr. Hill of Ipswich, petition of Bradford Hill, Elizabeth Poirier, Jo Ann Sprague, Michael J. Coppola, Bruce E. Tarr and Thomas P. Kennedy for legislation to provide for independent investigations by the Disabled Persons Protection Commission of abuse and neglect of mentally retarded persons. Referred to Human Services and Elderly Affairs.

The Commonwealth of Massachusetts
In the Year Two Thousand and Three.

AN ACT RELATIVE TO INDEPENDENT INVESTIGATIONS OF ABUSE AND NEGLECT OF MENTALLY RETARDED PERSONS.

*"Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same. as follows:*

*Whereas,* a stronger system of investigations into cases of abuse, mistreatment, human rights violations and neglect is required on the State level for individuals with mental retardation.

*Whereas,* The House Post Audit and Oversight Bureau's Multi-year Review of DMR concluded that "DMR has failed to develop a system of oversight that is able to identity problem cases and move swiftly to remove clients from dangerous or abusive situations," and the Bureau recommended that "dramatic changes in the investigations process should take place including such options as ceding substantial portions of the investigations unit to DPPC, complete abolition of the unit and transfer to an outside agency, or a complete restructuring of the oversight, monitoring and investigations process." *Whereas,* at current staffing levels the Disabled Persons Protection Commission (DPPC) is only able to investigate fifteen percent (15%) of the 1,500 cases of abuse that are currently screened in annually for investigation.

*Whereas,* the vast majority of 19C and non-19C cases of abuse, mistreatment, human rights violations and neglect involving individuals with mental retardation that are substantiated are investigated by the Department of Mental Retardation resulting in the agency investigating itself.

Whereas, the function of investigations should be independent of the agency providing the services. Effect the transfer of all current investigations staff, vacant positions and budget from the Department of Mental Retardation to the Disabled Persons Protection Commission hereinafter referred to as the Commission within 60 days of the enactment of this bill. The current DMR Director of Investigations shall report directly to and work with the Executive Director of the DPPC to effect the staff and budget *transfer.* No less than 30 full time equivalent positions shall comprise the transfer of staff from DMR to DPPC. All transferred staff are limited to conducting investigations of cases affecting only persons with mental retardation.

$3.5 million will be appropriated to the Disabled Persons Protection Commission to allow the Commission to investigate all 19C cases under their jurisdiction as well as non-19C (regulatory) cases involving individuals with mental retardation.

16

Eight months after the transfer, the Executive Director of the DPPC will recommend and justify to the general court an amount of additional funds to be appropriated to successfully conduct all 19C investigations and all non-19C investigations of cases involving individuals with mental retardation. Three years after the incorporation of DMR' s investigations staff into DPPC, an independent evaluation, under contract with the State Auditor's Office, shall be conducted to determine the effectiveness of the transfer and recommend appropriate actions such as continuance or other options as may be warranted to include but not be limited to a merging of investigative staff of other executive office of health and human services agencies to DPPC to accomplish objective and independent investigations for all Executive Office of Health and Human Services and the individuals they serve."

## Conclusion

22.    This opposing motion submitted is meant to serve on four fronts: (1) to overcome the

defendant's motion to dismiss this case, or alternately seeking summary judgment since there

are genuine issues to be tried; (2) allowing the plaintiff to submit a second amended

complaint within a 60 day time frame consisting of more "specific, nonconclusory factual

allegations giving rise to a reasonable inference of the improper motive" Judge V. City of

Lowell, 160 F. 3d 67, 75 (1st Cir. 1998); (3) all of the relevant allegations and correlating

information presented thus far requires a discovery phase allowing the plaintiff to submit and

obtain additional evidence that more than likely will indicate specific individuals affiliated

with the DMR knowingly (or possessed knowledge of other employees) engaging in a

deprivation of the rights asserted by the plaintiff to redress the aforementioned subject; and

or retaliating against the plaintiff's freedom of speech and expression activities as well; (4)

finally, these circumstances are similar to other recurring problems of public concern that

have faced its' Division of Investigations calling for a truly independent oversight to be

established remaining separate from the Executive Office of Health and Human Services to

ensure its independence and oversight cannot be inappropriately compromised.

## REQUEST FOR ORAL ARGUMENT

23.     Given the factual allegations cited in the plaintiff's amended complaint, the opposing

motion and his memorandum of points and authorities as well, if the court concludes that

a hearing is appropriate, the plaintiff requests for an oral argument to be held.


                        The Plaintiff,
                        On behalf of himself,


                        By: _____
                        JT Glover III, Pro-Se
                        46 Quincy Street #5
                        North Adams, MA 01247




                        CERTIFICATE OF SERVICE


        I, JT Glover III, herby certify that on December 29, 2003, I served a copy of the foregoing
**Memorandum of Points and Authorities supporting the plaintiff opposing motion** by First
Class, Certified Mail, postage prepaid on the following parties of record:

Assistant Attorney General Timothy Jones
Western Massachusetts Division
1350 Main Street
Springfield, MA 01103

**Articles published in The Boston Globe regarding the long-term problems facing the Divisions of Investigations of the DMR**

**March 11, 1992: "Sex Abuse Cover-up by State Agency Is Alleged"**

"The Legislature's Joint Committee on Human Services and Elderly Affairs is looking into allegations that the *Department of Mental Retardation engaged in a cover-up of an investigation* of alleged sexual abuse of three mentally retarded men in a Worcester group home.

Rep. Paul Kollios, co-chairmen of the human services committee, said yesterday that the committee had received information that someone in the Department of Mental Retardation 'whited-out' parts of an investigative report before it was forwarded to, as required, to the Disabled Persons Protection Commission, which oversees such cases."

Kollios said that if the information the committee has is correct, *the Department of Mental Retardation would be guilty of stumbling in the investigation and covering up. Then, Kollios said, the committee would either refer the case to the state attorney general's office or the Legislature's Post Audit-Committee for further investigation.*"

**July 29, 1992: "Report Criticizes Probe of Sex Abuse –Says Department Thwarted Findings"**

"Investigators for the Department of Mental Retardation *are not sufficiently independent,* answer to less experienced supervisors, and in one recent case, *were thwarted by managers trying to insulate the department from oversight,* a state monitoring agency has concluded"

In a twelve-page report critical of the department's handling of allegations that a worker sexually abused mentally retarded residents in a group home in a Worcester group home last year, the Disabled Persons Protection Commission recommended sweeping changes in the department' investigative practices, some of which the department has already implemented.

The result, the Commission concluded, *'is an investigative system, which does not clearly and independently express its views*; heightens the potential for decisions being made which do not promote protective considerations; *and encourages a system which attempts to insulate itself from external oversight.*"

**November 25, 1992: Retardation Department Chided in Report-State House Roundup**

"The state inspector general yesterday *released a report that found 'serious deficiencies' in the state Department of Mental Retardation's system of investigating and preventing abuse in its facilities."*

Moreover, *some DMR mangers have interfered with investigations, and other probes have been mismanaged because investigators had been poorly trained,* Cerasoli said. He continues, 'Until DMR acknowledges the importance of investigative function by addressing these difficulties, the abhorrent abuses that have been inflicted on DMR consumers in the past will continue unabated, Cerasoli warned in the report.

In his report, Cerasoli said many DMR employees told him the department *'has proven itself incapable of running its own Investigations Division.' Consequently, he recommended the appointment of an ombudsman with the power to punish those who obstruct investigations."*

**December 27, 1993: Suit Alleges DMR Abuse, Cover-ups: Three Plaintiffs Accuse Eleven Agency Superiors.**

"An investigator and two former investigators for the state Department of Mental Retardation charged in a lawsuit that the department censored reports of employees who abuse clients, covered up evidence of abuse and retaliated against employees who complained to outside authorities."

In a lawsuit filed last week in Suffolk Superior Court, the three plaintiffs *accuse their supervisors of altering written reports* and knowingly failing to investigate reports of sexual and physical of clients, or theft if clients' money, by DMR employees

*DMR has a policy of censoring internal investigations and reports to avoid embarrassing the department and to conceal its own negligence'* said Eric Maxwell of the Civil Liberties Union of Massachusetts, the plaintiff's lawyer."

**February 25, 1997: "Unreasonable Risk"**

"The two mentally retarded men who are believed to have endured four years of physical and emotional abuse by their unofficial guardians in Raynham did not fall through any crack. *They plummeted into an enormous gulf created by insufficient oversight and poor judgment by Department of Mental Retardation* and town officials."

"The state's hiring of inspectors has never kept pace with its zeal for deinstitutionalization. Too many clients are dispersed, isolated, and ignored." A state investigation, while welcomed is not sufficient. *The federal Department of Health and Human Services should review the Raynham case and increase its oversight of a shaky DMR.*

**April 4, 1997**: **"DMR knew of Raynham allegations; Report says agency failed to aid two men being abused in home."**

"State officials knew for four years of allegations that two mentally retarded men were being abused in a Raynham home, but they failed to help the men even when they observed 'a bad situation getting worse,' according to an investigative report released yesterday. One of the officials…did not respond properly to concerns of abuse and her office did not attend to many warning signs of improper care beginning in 1990 when a local school system referred the case of one of the men to the DMR, according to the investigation.

(Joseph) "Gallant (former HHS secretary) said the investigation detailed what went wrong in the case and he was proposing legislation to fix the problems. 'Now we must make the necessary changes to law and regulation so that we never see another case like this one,' he said in a statement. (Richard) Cohen (former DMR director of investigations) said his investigators never told him of the abuse allegations in 1993 and 1995.

*I think there were a number of breakdowns within the department with regard to this case, "* Cohen told the Associated Press. "I fully expect that when the matter of disciplinary action or correction action is taken up, what will come out is disciplinary action wouldn't be warranted against me."

**June 5, 1997**: **"Report slams 3 DMR officials; Probe of abuse at Fernald found lacking"**

"The Disabled Persons Protection Commission, an independent state investigative agency, yesterday called for the disciplining of three officials from the state Department of Mental Retardation, *saying that the department's investigation into allegations of abuse* at the Fernald State School in Waltham *was inadequate*. In a detailed report that examined three allegations of abuse involving the same resident in the period of July 1996 to November 1996, *the commission criticized the DMR's own investigation of the allegations and recommended that the department receive investigative training from the commission.*

Soon after the DMR report was issued, the Disabled Persons Protection Commission launched a probe into the department's handling of the affair. In a letter last month to the Disabled Persons Protection Commission executive director, John D. Dunn Jr., DMR Commissioner Gerald Morrissey acknowledged shortcomings in the initial investigation. *'We agree that there were inadequacies in the investigation process, investigation reports, and the implementation and monitoring of protective services,' Morrissey wrote.*

The commission report *also criticized DMR investigators for failing to provide for the safety of residents in the wake of the abuse allegations*. The report also concludes that the protective measures implemented by the Fernald School were inadequate in providing protection to the rape victim. In full, *the report concludes that there were 17 individual flaws in the DMR's investigation that undermined the credibility of the probe and its findings.* The conclusion states that the Disabled Persons Protection Commission Oversight Unit should have rejected the initial investigative report."

**April 30, 1998: "DMR probes called deficient; Panel says Crimes went unreported."**

"The panel was formed last year after the DMR was criticized for its handling of several high profile crimes, including the torture of two retarded men in a Raynham home and a rape of a retarded woman at the Fernald State School in Waltham. Both of these cases were first investigated, and mishandled, according to subsequent reviews, by DMR investigators.

This report released yesterday, *is at least the fifth review of the DMR investigative unit since 1992. Some critics contend the only solution is to disband the unit and have an independent agency conduct investigations of all abuse complaints involving the mentally retarded.* Scheibel said the call for an end to investigations by the DMR was 'a universal theme' at hearings across the state, but she said the panel believed the DMR could conduct effective investigations into less serious crimes if training and management were improved. But she warned that 'confidence and trust will have to be earned again.'"