UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| J.T. GLOVER, III,<br>      Plaintiff<br><br>    v.<br><br>GERALD MORRISSEY, PETER MORIN, BERNARD MURPHY, PAMELA NICHOLSON and LARRY TUMMINO,<br>      Defendants | Civil Action No. 03-11633-MAP |
| J.T. GLOVER, III,<br>      Plaintiff<br><br>    v.<br><br>HARRY COMERFORD, RICK HUNTINGTON, THERESA O'HARE and STEVEN WILLIAMS,<br>      Defendants | Civil Action No. 03-30213-MAP |

<u>REPORT AND RECOMMENDATION WITH REGARD TO DEFENDANTS'
MOTION TO DISMISS (Document No. 14 in Civil Action No. 03-11633-MAP)</u>
April 29, 2004

NEIMAN, U.S.M.J.

      Defendants -- various individuals affiliated with the Massachusetts Department of Mental Retardation ("DMR")-Western Massachusetts Regional Offices -- have moved to dismiss these consolidated actions brought pro se by J.T. Glover, III ("Plaintiff") pursuant to 42 U.S.C. § 1983 ("section 1983"). In essence, Plaintiff alleges that Defendants have interfered with his First Amendment right to petition by mishandling an investigation into the mistreatment of certain persons with

developmental disabilities. For the reasons set forth below, the court will recommend that Defendants' motion to dismiss, which has been referred to this court for a report and recommendation, *see* 28 U.S.C. § 636(b)(1)(B), be allowed.[1]

### I. FACTUAL BACKGROUND

Plaintiff's complaints in the consolidated actions are identical and extremely verbose, each spanning nearly 50 pages and well over 100 substantive paragraphs. In essence, the complaints (hereinafter referred to singly as the "complaint") purport to outline an unsuccessful whistle-blowing campaign Plaintiff has doggedly pursued over the past several years. In summary, Plaintiff makes the following allegations, which are stated in a light most favorable to him. *See Reppert v. Marvin Lumber & Cedar Co.*, 359 F.3d 53, 56 (1st Cir. 2004).[2]

On July 13, 1999, Plaintiff was fired from his job at Berkshire Family and Individual Resources, Inc. after he confronted a co-worker, Steven Conlon, about Conlon's "long-term maltreatment towards residents born with developmental disabilities in a group home where he and [Plaintiff] worked." (Complaint, § I ¶ 1.) One

---

[1] Although the motion to dismiss was filed only in Civil Action No. 03-11633-MAP ("the 11633 action"), it also applies to Civil Action No. 03-30213-MAP ("the 30213 action") with which the 11633 action has been consolidated. (See *infra*, n.4.)

[2] A separate memorandum and order issued this day addresses Defendants' Motions to Strike Documents and Information Submitted with Plaintiff's Opposition to Defendants' Motion to Dismiss (Docket No. 18 in the 11633 action and Docket No. 14 in the 30213 action) as well as Plaintiff's Motions for an Allowance of 60 Days to Resubmit a Second Amended Complaint Consisting of Additional Specific, Non Conclusory Allegations on how the Defendants Individually Participated in These Aforementioned Constitutional Deprivations (Docket No. 17 in the 11633 action and Docket No. 13 in the 30213 action).

week later, Plaintiff began reporting Conlon's actions to the Disabled Persons Protection Commission ("DPPC"), an arm of DMR. (*Id.* ¶ 2.)

On July 21, 1999, the day after Plaintiff's initial report, DPPC assigned an investigator, Jeffrey Paymen, who immediately interviewed Plaintiff. (Complaint, § II ¶ 14.) Plaintiff provided Paymen with numerous contacts who purportedly had material information. (*Id.* ¶¶ 14-26.)

In August of 1999, Plaintiff expressed concerns about Paymen's investigation to defendant Rick Huntington, DMR's Berkshire area director. (*Id.* ¶ 26.) Huntington suggested that Plaintiff should contact Maureen Kirk, an investigation supervisor. (*Id.*)

In October of 1999, Paymen reported his notes and findings. (*Id.* ¶¶ 28–30.) Paymen found against Plaintiff, stating the following in his report: "There is reason to accept the interpretation that [Plaintiff's] allegations . . . were knowingly filed in a false and misleading manner as retaliation against [Conlon] for a DPPC complaint [Conlon] had previously filed." (*Id.* ¶ 31.)

In early November of 1999, after learning of Paymen's report, Plaintiff provided him and several other DMR officials additional materials, i.e., "evidence" that Paymen and the investigations department "had mishandled these specific investigations." (*Id.* ¶¶ 32-33.) He also "filed an appeal directly to DMR['s] Commissioner," defendant Gerald Morrissey, and sent an e-mail message to defendant Teresa O'Hare, a DMR regional director, "requesting an appeal investigation and meeting(s) to be held with various DMR employees allowing [Plaintiff] the chance to redress these mishandled investigations." (*Id.* ¶¶ 33-34.)

On November 16, 1999, Paymen and another investigator, defendant Steven Williams, met with Plaintiff.  (*Id.* ¶¶ 35-36.)  They collected additional information from Plaintiff and the witnesses to whom he referred them.  (See *id.*)  On November 17, 1999, Plaintiff provided additional information to Huntington and requested to meet with him again.  (*Id.* ¶ 36.)

On November 22, 1999, another investigator, defendant Harry Comerford, was assigned to conduct "a follow-up investigation."  (*Id.* ¶ 37.)  Comerford initially met with Plaintiff and Kirk.  (*Id.* ¶ 38.)  Over the next few weeks, however, Plaintiff continued to express his concerns to DMR officials about Paymen and Williams' investigation and provided additional information.  (*Id.* ¶¶ 39-42.)

By early April of 2000, Plaintiff had become even more unhappy with the progress and results of the ongoing investigation and, on April 4, 2000, threatened DMR with "legal action in an effort to redress these matters."  (*Id.* ¶ 44-45.)  Plaintiff also provided additional information to DMR officials, including O'Hare, who replied: "I have reviewed the email you sent me.  I will be discussing with other involved parties next week and will reply after my discussions.  Thank you."  (*Id.* ¶ 45.)  On April 11, 2000, Comerford, the third investigator, conducted other interviews.  (*Id.*¶¶ 46-47.)

On April 27, 2000, Comerford, Huntington and Williams completed a "new investigative report."  (*Id.* ¶ 48)[3]  Plaintiff received a copy of the report on October 6, 2000.  (*Id.* ¶ 49.)  With regard thereto, he states the following in his complaint: "Since

---

[3]  In his complaint, Plaintiff identifies April 27, 2000 as the date Defendants' illegal acts were "initiated."  (*Id.*, § IV ¶ 1.)

4

this follow-up investigation was conducted and summarized in such a deceptive manner, the Division of Investigations of DMR Region I Springfield failed to appropriately redress these mishandled investigations initiated on July 20, 1999." (*Id.*) "Additionally," Plaintiff alleges, "because of false information included within this follow-up report, it appeared to retaliate against [my] freedom of expression and activities in the manner it was conducted. Employees of DMR Springfield were aware of [my] wishes to redress these accumulating grievances through legal proceedings three weeks before this investigation was completed on April 27, 2000." (*Id.* ¶ 50.)

In the fall of 2000, DMR's Senior Appeals Officer, defendant Pamela Nicholson, heard Plaintiff's appeal of the "mishandled investigations." (*Id.* ¶ 51.) "Nicholson informed [Plaintiff] that her responsibilities conducting this appeal existed independently from the DMR and that she wanted to complete it in the most appropriate manner allowable." (*Id.* ¶ 52.) Nicholson also outlined the appeal process to him. (*Id.* ¶¶ 52-54.) The "appeal was closed on January 25, 2001" in a report by Nicholson in which she declined "further reinvestigating the additional discrepancies surrounding . . . Comerford's investigation." (*Id.* ¶ 54.)

On January 29, 2001, Plaintiff provided additional documentation to Morrissey and to DMR's Deputy General Counsel, defendant Peter Morin. (*Id.* ¶ 56.) Plaintiff did this to inform them of his "immense concerns relating to these specific investigations and how the appeal report [was] being mishandled by the DMR" as well as the "mistaken conclusions" in Nicholson's appeal report. (*Id.*) He continued to forward information to DPPC officials between May and July of 2001. (*Id.* ¶¶ 57-60.)

In August of 2001, Plaintiff brought his concerns to Barbara Mazella of the Governor's Commission on Mental Retardation. (*Id.* ¶¶ 61-62.) In a letter dated August 29, 2001, Mazella informed Plaintiff she had looked into the matter and found that "Morrissey has accepted the findings of [Nicholson] and has sent you a letter indicating that decision." (*Id.* ¶ 67.) "Your only option," Mazella, continued, "is to file a legal challenge in court and start legal proceedings." (*Id.*)

At around the same time, Plaintiff provided information to many politicians, including Senator Edward Kennedy. (See *id.* ¶¶ 71-74.) At Plaintiff's prompting, Senator Kennedy made an inquiry of Morrissey who, on September 18, 2001, responded as follows:

> Please be assured that [Plaintiff]'s concerns have been relayed to the Department as well. His allegations were investigated and an appeal was filed. [Plaintiff] was given sufficient time to supply facts to bolster his claim. A 30-page appeal decision was handed down. Part of that decision reaffirmed some of [Plaintiff]'s contentions, but the majority were not substantiated. If [Plaintiff] gives your office permission, we would be more than willing to share the results of the appeal with you. You should be aware that the Massachusetts Governor's Commission on Mental Retardation was also contacted by [Plaintiff], and our legal staff shared the appeal with them to their satisfaction.

(*Id.* ¶¶ 74-75.)

Thereafter, in a letter dated November 30, 2001, Morin, having been contacted by various political figures, responded to Plaintiff as follows:

> Please be advised that both the Governor's Office and Gerald J. Morrissey, Jr., Commissioner of the [DMR], have directed me to respond to your recent correspondence. Please be assured that all your submissions have been

6

> carefully reviewed. Commissioner Morrissey accepted the appeal report's findings and notified you of this outcome on or about January 25, 2001. Your correspondence has resulted in this appeal report being reviewed by Barbara Mazella, Administrator of the Governor's Commission on Mental Retardation. Ms. Mazella found that the appeal report was fair and thorough.

(*Id.* ¶ 76.)

In December of 2001, Plaintiff also contacted DPPC General Counsel Gail Quinn to "perform a quality review of these investigations and appeal report pursuant to Mass[.] Gen. Laws [ch.] 19C[,] sections 3, 5, 9 and 11." (*Id.* ¶ 82.) In a letter to Plaintiff dated December 17, 2001, Quinn denied Plaintiff's request, stating the following:

> From the numerous reviews of the cases in which you were involved in some capacity, it has been determined, and affirmed on your appeal to the [DMR], that the provisions of each of these sections of the statute were complied with. The DPPC Executive Director reviewed the issues again upon receipt of your previous request for a Commissioner's Investigation, and concluded that these issues had been properly dealt with through the appeals process. No new information is presented in your correspondence to alter that view. Therefore, the Executive Director declines to further review this matter and has again determined that this matter is not appropriate for a Commissioner's review. The [DPPC] believes that these cases have been thoroughly, fairly, and fully investigated and reviewed for appeal and reconsideration.

(*Id.* ¶ 83.)

Between January and October of 2002, Plaintiff continued to bring his concerns to the attention of political figures and other federal officials and agencies, including the Office of Civil Rights at the United States Federal Department of Health and Human Services. (*Id.* ¶¶ 88-102.) He also continued to lobby state officials. (*Id.* ¶¶ 103-115.)

On May 23, 2003, Morin wrote Plaintiff a final letter in which he summarized the saga as follows:

> The [DMR] devoted significant resources to your appeal. It is the Department's position that your appeal was thoroughly and fairly considered. All inquiries brought on your behalf by the offices of former Governor Swift, the Governor's Commission on Mental Retardation and Senator Kennedy have been responded to in an open and cooperative manner. Upon review of the materials provided them each of the aforementioned offices have indicated their satisfaction with the Department's actions.

(*Id.* ¶ 115.) Plaintiff considers Morin's May 23, 2003 letter "additional misleading information." (*Id.* ¶ 116.)

## II. PROCEDURAL BACKGROUND

Plaintiff instituted these actions in September of 2003 and both are now assigned to District Judge Michael A. Ponsor.[4] On the complaint's cover page, Plaintiff alleges that Defendants "engaged in a deprivation of rights secured by the US Constitution by inappropriately interfering with [Plaintiff]'s effort of redressing mishandled investigations conducted by [DMR]'s Division of Investigations/Appeals Unit." The complaint seeks $200,000 in damages and, on its last page, raises a single

---

[4] The 11633 action was instituted in Boston on September 2, 2003, and assigned to District Judge Douglas P. Woodlock. Then, on November 13, 2003, pursuant to an "assented to" motion, the 11633 action was reassigned to Judge Ponsor in Springfield. Meanwhile, on September 3, 2003, the 30213 action was instituted in Springfield and assigned, with the parties' consent (*see* 28 U.S.C. § 636(c)), to the undersigned. An amended complaint was filed in both actions on October 17, 2003. Upon Plaintiff's "assented to" motion, the 30213 action was then consolidated into the 11633 action. *See* Local Rule 40.1(J) ("A motion for consolidation of two or more cases shall be made in the case first filed in this court."). Because there is not complete consent in the 11633 action, however, the cases are now both within Judge Ponsor's jurisdiction.

cause of action alleging, pursuant to section 1983, a continuing violation (initiated on April 27, 2000) of Plaintiff's First Amendment right to petition. (Complaint, § IV ¶ 1.) In due course, Defendants filed the instant motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).[5]

### III. STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss should be granted when a review of the complaint shows that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *See* Fed. R. Civ. P. 12(b)(6); *Wagner v. Devine*, 122 F.3d 53, 55 (1st Cir. 1997). The court must accept the allegations of the complaint as true, drawing all reasonable inferences in favor of the plaintiff. *See Albright v. Oliver*, 510 U.S. 266, 268 (1994). If a plaintiff's claims do not establish recognized legal theories for which relief may be granted, then the court must dismiss the complaint. *See Wilson v. Civil Town of Clayton*, 839 F.2d 375, 378 (7th Cir. 1988).

To be sure, a plaintiff's pro se allegations are entitled to a liberal construction no matter how inartfully pleaded. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). Nevertheless, dismissal is appropriate when a plaintiff cannot prove any set of facts entitling him to relief. *See Ahmed v. Rosenblatt*, 118 F.3d 886, 890 (1st Cir. 1997).

### IV. DISCUSSION

Defendants make three dismissal arguments: (1) sovereign immunity bars the action against Defendants in their official capacities; (2) Plaintiff's allegations against

---

[5] Alternatively, Defendants' motion seeks summary judgment pursuant to Rule 56 or dismissal pursuant to Rule 12(b)(1). It became clear at oral argument, however, that the motion is most appropriately analyzed pursuant to Rule 12(b)(6).

Defendants, in their individual capacities, fail to state a claim under the First Amendment's petition clause; and (3) in any event, Defendants are entitled to qualified immunity. The court will discuss these arguments in turn.

A. <u>Sovereign Immunity</u>

With regard to Defendants being sued in their official capacities, "the Supreme Court has held that, in the [section] 1983 context, where a suit is brought against individual public officials in their official capacities, such a suit is effectively to be considered a suit against the officials' office(s)." *Navedo v. Maloney*, 172 F. Supp. 2d 276, 289 (D. Mass. 2001) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)). *See also Wang v. New Hampshire Bd. of Registration in Medicine*, 55 F.3d 698, 700-01 (1st Cir. 1995). Such claims against the state office itself, however, are barred by the Eleventh Amendment on sovereign immunity grounds. *See Navedo*, 172 F. Supp. 2d at 289. Thus, insofar as Plaintiff's section 1983 claim is directed either at DMR or Defendants in their official capacities, dismissal is in order. *See also Florida Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 684 (1982).

By specifically naming the defendants, however, Plaintiff may be seeking to invoke a sovereign immunity exception commonly referred to as the *Ex parte Young* doctrine. The First Circuit recently summarized the parameters of this exception as follows:

> As a general matter the several states are immune under the Eleventh Amendment from private suit in the federal courts, absent their consent. Among the exceptions to this rule is the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), which allows a plaintiff to enforce a claim of federal right by

10

> obtaining injunctive or declaratory relief against a state officer in the officer's official capacity. In *Edelman v. Jordan*, 415 U.S. 651 (1974), the Supreme Court explained that the purpose of this exception is to prevent continuing violations of federal law, but not to remedy past violations. Therefore, an *Ex parte Young* plaintiff may obtain prospective, but not retrospective, relief. *See id.* at 664-65; *see also Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 294 (1997) (O'Connor, J., concurring in part and concurring in the judgment) ("[A] *Young* suit is available where a plaintiff alleges an ongoing violation of federal law, and where the relief sought is prospective rather than retrospective."); *id.* at 298 (Souter, J., dissenting) (observing that, given the disposition of the Justices in that case, "Justice O'Connor's view is the controlling one").

*Greenless v. Almond*, 277 F.3d 601, 606-07 (1st Cir. 2002) (footnote omitted).

Unfortunately for Plaintiff, his section 1983 claim cannot be viewed under *Ex parte Young* because he requests no prospective injunctive relief. Plaintiff seeks monetary damages only, relief which is barred by the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 119-20 (1984); *Quern v. Jordan*, 440 U.S. 332, 337 (1979). Accordingly, the court will recommend that the complaint, insofar as it is an "official-capacity" suit, should be dismissed on sovereign immunity grounds.

    2. Petition Clause

As for Defendants being sued in their individual capacities, Plaintiff concedes that his single section 1983 cause of action is a First Amendment petition clause claim, i.e., that Defendants "engaged in a pattern of activity, interfering with [Plaintiff]'s rights of petitioning various governmental offices to redress [his] grievances" (Complaint, § I ¶ 5), and is limited to "intentional" acts which Defendants committed beginning on April

27, 2000 (see *id.*, cover page and § IV ¶ 1).  Plaintiff also acknowledges that the specificity of his pleading is to be gauged under the heightened pleading standard of *Judge v. City of Lowell*, 160 F.3d 67 (1st Cir. 1998).[6]  In other words, Plaintiff concedes that, to survive dismissal, he must plead as to each Defendant "specific facts from which to infer illegal motive."  *Id.* at 74 (quoting *Crawford-El*, 523 U.S. at 598).

In the court's view, Plaintiff has not sustained his pleading burden.  Although Plaintiff's complaint is prolix, there are no "specific facts" therein "from which to infer

---

[6] This court recently summarized *Judge*'s heightened pleading standard for individual capacity actions against government officials as follows:

> [W]hile *Leatherman* [*v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993)] held that heightened pleading is not generally required for civil rights claims targeting governmental bodies, it also suggested, as the First Circuit has noted, that "the result might be different in individual capacity actions against government officials."  *Judge*, 160 F.3d at 73 (citing *Leatherman*, 507 U.S. at 168).  In fact, five years after *Leatherman*, the Supreme Court took this "suggestion" one step further and stated that when a government *official* is targeted for engaging in illegal discrimination, "the [trial] court may insist that the plaintiff put forward specific, nonconclusory factual allegations that establish improper motive causing cognizable injury in order to survive a prediscovery motion for dismissal . . . ."  *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) (citations and internal quotation marks omitted).
>
> To be sure, this last quoted statement from *Crawford-El* is dicta.  Nonetheless, the suggestion that civil rights plaintiffs may be required to plead "specific, nonconclusory factual allegations that establish improper motive" by a governmental official is considered by the First Circuit to be an affirmation of its own pre-*Leatherman* decisions.  *See Judge*, 160 F.3d at 74-75 (describing "unequivocal language" of Supreme Court's statement in *Crawford-El* as "strong dicta" in congruence with *Dartmouth Review v. Dartmouth College*, 889 F.2d 13 (1st Cir. 1989), and *Correa-Martinez v. Arrillaga-Belendez*, 903 F.2d 49 (1st Cir. 1990)).

*Lorenzo v. Gallant*, Civil Action No. 01-30210-MAP, 2002 WL 31833751, at **8-9 (D. Mass. Oct. 28, 2002) (rep't and rec. adopted Dec. 16, 2002) (footnote omitted).

illegal motive" on the part of any of the Defendants. Indeed, one Defendant, Larry Tummino, is never mentioned, another, O'Hare, is only briefly mentioned prior to the crucial date of April 27, 2000 (complaint, § II ¶¶ 34 and 45), and a third, Murphy, is listed only as having received a copy of a document Plaintiff distributed on July 20, 2002 (*id.* ¶ 60). As to the defendants about whom more "facts" are provided, those facts fail to support any inference that some illegality motivated any of their actions. If anything, the complaint, as a whole, belies the suggestion that Defendants interfered with Plaintiff's right to petition. Rather, the allegations indicate that Defendants, and numerous other state and federal officials, have been cooperative and exceedingly responsive to Plaintiff's concerns.

As a result, the court concludes that the complaint fails to state a petition clause claim upon which relief may be granted. As District Judge Patti B. Saris has stated:

> The "right to petition government" afforded by the First Amendment does not include the absolute right to speak in person to officials. Where written communications are considered by government officials, denial of a hearing does not infringe upon the right to petition. The right to petition government does not create in the government a corresponding duty to act.

*Cronin v. Town of Amesbury*, 895 F. Supp. 375, 389-90 (D. Mass. 1995), *aff'd*, 81 F.3d 257, 261 n.4 (1st Cir. 1996). *See also Minnesota State Bd. for Community Colleges v. Knight*, 465 U.S. 271, 283 (1984) ("The Constitution does not grant to members of the public generally a right to be heard by public bodies making decisions of policy."); *Wagner v. City of Holyoke*, 241 F. Supp. 2d 78, 83 (D. Mass. 2003) ("The right to petition the government for grievances is not unlimited."); *Evicci v. Baker*, 190 F. Supp.

2d 233, 241 (D. Mass. 2002) (plaintiff must show some meaningful restriction on petitioning activities). Accordingly, insofar as the complaint targets Defendants individually, the court will recommend that the motion to dismiss be allowed.

### 3. Qualified Immunity

Based on the foregoing, it is unnecessary to address Defendants' qualified immunity argument, although it appears strong. According to the Supreme Court, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In the court's view, this qualified immunity standard would appear to bar Plaintiff's claim.

### V. CONCLUSION

For the reasons stated, the court recommends that Defendants' motion to dismiss be ALLOWED.[7]

---

[7] The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980). *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

DATED: April 29, 2004

      /s/ Kenneth P. Neiman
KENNETH P. NEIMAN
U.S. Magistrate Judge